## STATE OF CONNECTICUT *v.* ANDREW D. WILSON
### (SC 15310)

Borden, Berdon, Norcott, Katz, Palmer, McDonald and Peters, Js.[1]

---

[1] This case first was argued before five justices of this court on December 4, 1996. Subsequent to oral argument, however, the court decided, sua sponte, to consider the case en banc, and reargument before the en banc panel was conducted on February 20, 1997.

Argued February 20—officially released August 26, 1997

*Wesley W. Horton*, with whom were *Susan M. Cormier, Joseph G. Bruckmann*, public defender, and, on the brief, *Monte P. Radler*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan*, state's attorney, and *David I. Cohen*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. This appeal requires us to define the term "wrongfulness" for purposes of the affirmative defense of insanity under General Statutes § 53a-13 (a).[2]

---

[2] General Statutes § 53a-13 provides: "Lack of capacity due to mental disease or defect as affirmative defense. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

"(b) It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a prescribing practitioner, as defined in subdivision (22) of section 20-571, and was used in accordance with the directions of such prescription.

A jury convicted the defendant, Andrew Wilson, of murder in violation of General Statutes § 53a-54a.[3] On appeal,[4] the defendant claims that the trial court improperly instructed the jury regarding the insanity defense. We agree and, consequently, we reverse the judgment of conviction.[5]

The following facts are undisputed. The defendant and the victim, Jack Peters, were acquainted through

"(c) As used in this section, the terms mental disease or defect do not include (1) an abnormality manifested only by repeated criminal or otherwise antisocial conduct or (2) pathological or compulsive gambling." We use the current statute herein because there are no relevant differences between this statute and that in effect at the time of the offense.

[3] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

[4] The defendant appeals pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[5] The defendant also claims that the trial court improperly: (1) denied the jury's request for a copy of the parties' closing arguments; (2) denied him the opportunity to present a surrebuttal argument to the jury; and (3) denied his motion to suppress his postarrest statement on the ground that the police obtained the statement in violation of his rights under article first, § 8, of the Connecticut constitution. We decline to address the defendant's first claim because it is unlikely to arise on retrial. In addition, we decline to address the defendant's second claim because, even if it were to arise again at retrial, it would require a discretionary determination by the trial court on the basis of the specific facts and circumstances presented. With respect to his third claim, we agree with the state that the defendant failed to provide an adequate state constitutional analysis in his original brief. Although the defendant did revisit the issue in his reply brief, "[i]t is a well

the victim's son, Dirk Peters, with whom the defendant had attended high school. In early 1993, the defendant began to exhibit symptoms of a mental disorder manifested by a delusional belief that Dirk, assisted by the victim, systematically was destroying the defendant's life.[6] Specifically, the defendant believed that, in 1981, Dirk had poisoned him with methamphetamine and had hypnotized him in order to obtain control of his thoughts. The defendant believed that Dirk had been acting with the approval of the victim, who, the defendant also believed, was the mastermind of a large organization bent on controlling the minds of others. The defendant further believed that Dirk and the victim were responsible for the defendant's loss of employment, sexual inadequacy, physical weakness and other incapacities, as well as the deaths of the defendant's mother and several family dogs. In addition, the defendant blamed the victim and Dirk for the breakup of the defendant's relationship with a former girlfriend.

Beginning in approximately February, 1993, the defendant began contacting law enforcement authorities to inform them of the conspiracy by the victim and Dirk to destroy his life and the lives of others. He informed the police that Dirk was continuing to drug and brainwash people, and that Dirk should be stopped. He blamed the victim and Dirk for his own drug involvement and claimed that they were ruining other people's lives as well.[7] In May and June, 1993, the defendant

established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 593 n.26, 657 A.2d 212 (1995). Accordingly, we decline to consider the defendant's state constitutional claim.

[6] Both the state and the defendant agree that, at the time of his offense, the defendant suffered from a mental disorder manifesting itself as a delusional belief system. The parties dispute, however, the extent and severity of the disorder and its effect on the defendant's ability both to control his conduct and to appreciate the wrongfulness of his actions.

[7] For example, the defendant sent audiotapes to the police, one of which was accompanied by a letter stating, "Hopefully, the decent people of the

repeatedly called the police, requesting their assistance in combatting the mind control conspiracy by the victim and Dirk. The police informed him that it was impossible to investigate his allegations.

On August 5, 1993, the defendant went to see the victim at his home in the city of Greenwich. He quarreled with the victim and then shot him numerous times with a semiautomatic handgun that he had purchased two days earlier from a gun dealer in the city of New Haven.

Later that day, the defendant entered the Greenwich police headquarters and stated that he had shot the victim because he "had to do it." The defendant thereafter gave a sworn statement to the police in which he indicated, among other things, that: (1) his life had been ruined by Dirk, who had drugged, hypnotized and brainwashed him; (2) the victim had assisted Dirk in these activities; (3) Dirk and the victim were responsible for the defendant's schizophrenia; (4) the conduct of Dirk and the victim required "drastic action" and "drastic retribution"; and (5) the defendant had shot the victim repeatedly at the victim's home earlier that day.

At trial, the defendant raised his mental illness as an affirmative defense under § 53a-13. The jury, however, rejected the defendant's claim of insanity and convicted him of murder. The trial court rendered judgment sentencing the defendant to sixty years imprisonment. This appeal followed.[8]

The primary issue raised by this appeal is whether the trial court improperly failed to give an instruction defining the term "wrongfulness" under § 53a-13 (a). Section 53a-13 (a) provides that "[i]n any prosecution

---

world can somehow be protected from [the] wrath of methamphetamine. . . . Maybe before dozens more people are similarly poisoned with this toxin at the hands of [Dirk] Peters . . . ."

[8] Additional facts will be provided as necessary.

for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the *wrongfulness* of his conduct or to control his conduct within the requirements of the law." (Emphasis added.) In this case, the defendant requested that the trial court instruct the jury that wrongfulness is comprised of a moral element, so that "an accused is not criminally responsible for his offending act if, because of mental disease or defect, he believes that he is morally justified in his conduct—even though he may appreciate that his act is criminal."[9] The trial court, however, refused to instruct the jury that the defendant was entitled to prevail under § 53a-13 (a) if the evidence established that the defendant believed his conduct to be morally justified.[10] The defendant argues that the court's failure

[9] The defendant's request to charge on the defense of lack of capacity due to mental disease or defect read in its entirety: "As I have mentioned, one of the two alternative ways the defendant can establish the defense of lack of capacity due to a mental disease or defect is to prove that, at the time of the offense, because of a mental disease or defect he lacked substantial capacity to appreciate the wrongfulness of his conduct. In order to appreciate the wrongfulness of his conduct, the defendant must have understood, both intellectually and emotionally, that his actions were wrong. Under this alternative of this affirmative defense, an accused is not criminally responsible for his offending act if, because of mental disease or defect, he believes that he is morally justified in his conduct—even though he may appreciate that his act is criminal. A defendant lacks substantial capacity to appreciate the wrongfulness of his conduct if he knows his act to be criminal but commits it because of a delusion that it is morally justified. Thus, if you find that the defendant, at the time of the offense, suffered from a delusion rendering his act morally justified in his mind, he has established the affirmative defense and you must return a verdict of not guilty by reason of lack of capacity due to mental disease or defect."

[10] The trial court instead instructed the jury in relevant part: "The first of the two alternative parts of this [insanity defense] is that the defendant lacked substantial capacity to appreciate the wrongfulness of his conduct. This means that he lacked substantial capacity to understand both intellectually and emotionally, that his actions were wrong. This does not include . . . a person whose faculties were impaired in some measure but were still sound enough for him to understand that his conduct was wrong. Not

to charge the jury on this moral component of the insanity defense requires reversal. The state, on the other hand, contends that the defendant was not entitled to such an instruction but that, even if he were, the trial court's failure to give this instruction did not constitute harmful error.

Our resolution of the defendant's claim requires us to answer three subordinate questions: (1) How should a trial court define the term "wrongfulness" as it is used in § 53a-13 (a) when a definitional instruction of that term is requested?[11] (2) Was such an instruction necessary in this case in view of the evidence presented at trial and the defendant's request to charge? and (3) Did the trial court's failure to give a jury instruction properly defining "wrongfulness" constitute harmful error? We conclude that the defendant was entitled to receive an instruction properly defining the term "wrongfulness" and, further, that the trial court's failure to give such an instruction was harmful. Accordingly, we reverse the judgment of the trial court.

I

In determining the appropriate definition of the term "wrongfulness" under § 53a-13 (a), we are guided by familiar principles of statutory construction. "Our fundamental objective is to ascertain and give effect to the

every mental deficiency or abnormality leaves a person without substantial capacity to appreciate the wrongfulness of his conduct. It is only when he lacks substantial capacity to appreciate that a particular act or course of conduct was wrong that this part of the affirmative defense excuses him from criminal liability."

[11] Prior to the reargument of this appeal before an en banc panel of this court; see footnote 1 of this opinion; we ordered the parties to be prepared to address the following question: "Assuming that the defendant is entitled to a jury instruction, pursuant to General Statutes § 53a-13, in which 'the wrongfulness of his conduct' is defined to include the concept of moral justification, must this concept be limited to moral justification as defined by those standards generally recognized by society, or may it also include the defendant's own subjective standards?"

apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994). The language of the statute itself does not illuminate our inquiry. In ascertaining the meaning of the language of § 53a-13 as it applies to this case, therefore, we look, in the first instance, to the relevant legislative history for guidance. That legislative history includes the genealogy of the insanity defense in this state, the history of the Model Penal Code provision upon which § 53a-13 is based and the legislative debate surrounding the enactment of § 53a-13.

Prior to the enactment of § 53a-13, legal insanity was determined on the basis of a two part test established under our common law.[12] In 1967, as a result of growing dissatisfaction with the standards from which this common-law test derived, the General Assembly adopted

---

[12] Under this test, a defendant would be considered legally insane if: (1) he lacked the "mind, capacity, reason and understanding sufficient to have enabled him to judge of the nature, character and consequences of the act charged against him, that the act was wrong and criminal, [or] that the commission of it would justly and properly expose him to punishment"; or (2) if, in committing the act, he was "overcome by an irresistible impulse arising from mental disease." (Internal quotation marks omitted.) *State* v. *Toste*, 178 Conn. 626, 630, 424 A.2d 293 (1979). Thus, the first part of the common-law test focused on the defendant's *cognitive* ability either to understand the nature of his act or to know that his act was criminal. This cognitive prong derived from the nineteenth century English rule set forth in *M'Naghten's Case*, 8 Eng. Rep. 718 (1843), and later imported into the common law of the United States. See *State* v. *Toste*, supra, 630. The second prong of the defense, known as the "irresistible impulse" test, focused on the defendant's *volitional* capacity to act in accordance with his knowledge and also derived from an earlier common-law tradition. See id., 631.

the American Law Institute's Model Penal Code test for insanity, now codified at § 53a-13,[13] as a statutory standard to be invoked in lieu of the common-law test. *State* v. *Toste*, 178 Conn. 626, 631, 424 A.2d 293 (1979). The Model Penal Code test provides, in language nearly identical to that now contained in § 53a-13 (a), that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." (Brackets in original.) I A.L.I., Model Penal Code and Commentaries (1985) § 4.01 (1), p. 163 (hereinafter Model Penal Code).

For purposes of this appeal, three features of the Model Penal Code test are noteworthy. First, like our prior common-law standard, this test encompasses, albeit in a different form, both a cognitive and a volitional prong. Under the cognitive prong, a person is considered legally insane if, as a result of mental disease or defect, "he lacks substantial capacity . . . to appreciate the criminality [wrongfulness] of his conduct." Id. Under the volitional prong, a person also would be considered legally insane if "he lacks substantial capacity . . . to conform his conduct to the requirements of law." Id. Because the defendant does not claim that the trial court misinstructed the jury on the volitional prong of the insanity test, we need not consider the application of the volitional prong in our analysis.

Second, the Model Penal Code test focuses on the defendant's actual *appreciation of,* rather than merely his *knowledge of,* the wrongfulness of his conduct. Cf. General Statutes § 53a-13 (a) (defendant must lack "sub-

---

[13] The insanity defense originally was codified at General Statutes (Rev. to 1968) § 54-82a.

stantial capacity, as a result of mental disease or defect . . . to appreciate the wrongfulness of his conduct"). The drafters of the Model Penal Code purposefully adopted the term "appreciate" in order to account for the defendant whose "detached or abstract awareness" of the wrongfulness of his conduct "does not penetrate to the affective level." I Model Penal Code, supra, § 4.01, comment 2, p. 166. As Herbert Wechsler, chief reporter for the Model Penal Code, stated in his model jury charge: "To appreciate the wrongfulness of conduct is, in short, to realize that it is wrong; to understand the idea as a matter of importance and reality; to grasp it in a way that makes it meaningful in the life of the individual, not as a bare abstraction put in words." Id., § 4.01, appendix C, p. 215.

The third important feature of the Model Penal Code test, and the most relevant for purposes of this appeal, is its alternative phrasing of the cognitive prong. By bracketing the term "wrongfulness" and juxtaposing that term with "criminality," the drafters purposefully left it to the individual state legislatures to decide which of these two standards to adopt to describe the nature of the conduct that a defendant must be unable to appreciate in order to qualify as legally insane. See id., § 4.01, explanatory note, p. 164; A.L.I., 38th Annual Meeting, Proceedings (1961) p. 315 (hereinafter Annual Meeting), remarks of Wechsler ("it seems to me appropriate that the final formulation [by the American Law Institute] present[s] these [terms] as alternatives"). The history of the Model Penal Code indicates that "wrongfulness" was offered as a choice so that any legislature, if it wishes, could introduce a "moral issue" into the test for insanity. Annual Meeting, supra, p. 315, remarks of Wechsler.[14]

---

[14] Similarly, the commentary to the Model Penal Code distinguishes "criminality" and "wrongfulness" on the basis of the "moral disapproval" implicated by the latter. I Model Penal Code, supra, § 4.01, comment 3, p. 169. In choosing the term "wrongfulness" over "criminality," the drafters also

There is little dispute in this case that, by choosing the term "wrongfulness" instead of "criminality," the legislature intended to import this moral element into Connecticut's insanity statute. Indeed, Representative David H. Neiditz, the principal proponent of the public act later codified at § 53a-13, stated that the term "wrongfulness" was used in order to "include the case where the perpetrator appreciates that his conduct is criminal but because of [his] illusion believes it be *morally justified.* I think it's the better formulation . . . ." (Emphasis added.) 12 H.R. Proc., Pt. 6, 1967 Sess., p. 2585. Representative Neiditz based his interpretation of the Model Penal Code test on the analysis employed by the Court of Appeals for the Second Circuit in *United States* v. *Freeman,* 357 F.2d 606, 622 n.52 (2d Cir. 1966). In *Freeman,* the court adopted the "wrongfulness" standard and concluded that the term applied to a defendant who knew his conduct to be illegal but who believed that it was morally justified due to his delusion or mental defect. Id.; see 12 H.R. Proc., supra, p. 2585, remarks of Representative Neiditz ("the wording that was adopted . . . is the exact formulation as used in the '*Freeman*' case").

The more difficult question, and the issue that we asked the parties to address at the reargument of this appeal; see footnote 11 of this opinion; is how properly to define the moral element inherent in the term "wrongfulness" under § 53a-13 (a).[15] The defendant contends

intended, to some extent, to "hark[en] back to the traditional [*M'Naghten*] rule." Annual Meeting, supra, p. 316, remarks of American Law Institute vice president John G. Buchanan.

[15] We strongly disagree with Justice Berdon's conclusion that *United States* v. *Freeman,* supra, 357 F.2d 606, resolves this question. Contrary to Justice Berdon and the 1985 American Law Institute commentary to which he cites—which we emphasize was *not* the commentary upon which our legislature relied in enacting § 53a-13 some twenty years earlier—the statement in *Freeman* that a defendant should not be held criminally responsible if, because of mental disease or defect, he "believes [his conduct] to be morally justified"; id., 622 n.52; does not address the central issue raised in this

that morality must be defined in purely personal terms, such that a defendant is not responsible for his criminal acts as long as his mental disease or defect causes him *personally* to believe that those acts are morally justified, even though he may appreciate that his conduct is wrong in the sense that it is both illegal and contrary to societal standards of morality. See *United States* v. *Segna*, 555 F.2d 226, 232–33 (9th Cir. 1977) (adopting personal standard). The state, on the other hand, contends that morality must be defined by societal standards, such that a defendant is responsible for his criminal acts *unless*, because of mental disease or defect, he lacks substantial capacity to appreciate that his actions were wrong under *society's* moral standards. Although we agree with the state that the proper test must incorporate principles of societal morality, we conclude that the state's interpretation of the cognitive prong of § 53a-13 (a) does not sufficiently account for a delusional defendant's own distorted perception of society's moral standards. Accordingly, we conclude that a defendant may establish that he lacked substantial capacity to appreciate the "wrongfulness" of his conduct if he can prove that, at the time of his criminal act, as a result of mental disease or defect, he substantially misperceived reality and harbored a delusional belief that society, *under the circumstances as the defendant honestly but mistakenly understood them,* would not have morally condemned his actions.

Before addressing the legislative and jurisprudential principles that undergird our interpretation of § 53a-13 (a), however, we first must consider the contrary view

case. At issue in this case, as distinguished from *Freeman*, is whether a defendant's belief in the moral justification of his actions may be measured in purely *personal* terms or whether that belief must encompass an appreciation that *society* would not have morally condemned his actions. Indeed, we note that no other case has characterized *Freeman* as adopting a purely personal test, including *United States* v. *Segna*, 555 F.2d 226, 232–33 (9th Cir. 1977), the only case ever to have adopted such a test.

advanced by the defendant. We conclude that the defendant's efforts to define morality in purely personal terms are inconsistent with the Model Penal Code,[16] judicial precedent, and the assumptions underlying our criminal law.

The text accompanying § 4.01 of the Model Penal Code, upon which § 53a-13 is modeled, suggests that its drafters intended that the moral element of "wrongfulness" be measured by a defendant's capacity to understand society's moral standards. In his model jury charge, for example, Professor Wechsler suggests the following language: "[A] person may have knowledge of the facts about his conduct and of the immediate surrounding circumstances and still be rendered quite incapable of grasping the idea that it is wrong, in the sense that it is condemned by the law and *commonly accepted moral standards*." (Emphasis added.) I Model Penal Code, supra, § 4.01, appendix C, p. 214. Similarly, the commentary on the insanity test of the Model Penal Code emphasizes a defendant's capacity to appreciate "society's moral disapproval of his conduct," noting that "[a]ppreciating 'wrongfulness' may be taken to mean appreciating that the *community* regards the behavior as wrongful." (Emphasis added.) Id., § 4.01, comment 3, p. 169. Although the rejection under the Model Penal Code of the personal standard is not beyond debate,[17]

[16] Although the question before us is one of statutory interpretation, we begin with the Model Penal Code, rather than with the legislative debate preceding the enactment of § 53a-13, because the legislative debate does not conclusively resolve this issue. Although Representative Neiditz stated that "wrongfulness" was chosen instead of "criminality" to accommodate the delusional defendant who believes that his acts are "morally justified"; 12 H.R. Proc., supra, p. 2585; it is not readily apparent either from Representative Neiditz' remarks or from the case law upon which he relied; see *United States* v. *Freeman*, supra, 357 F.2d 622 n.52; whether the phrase "morally justified" was intended, as the defendant asserts, to mean morally justified according to the defendant's own personal morals.

[17] The commentary does address the possibility that legislatures may take "the wrongfulness standard . . . to refer to the actor's own moral perception . . . ." I Model Penal Code, supra, § 4.01, comment 3, pp. 169–70. We

we conclude that the drafters of § 4.01 did not intend that a defendant who appreciates *both* the illegality and the societal immorality of his actions be relieved of criminal responsibility due to his purely personal, albeit delusional, moral code.

Moreover, the large majority of other jurisdictions that have considered the cognitive prong of the insanity defense has chosen a societal, rather than a personal, standard. See *State* v. *Corley*, 108 Ariz. 240, 242–43, 495 P.2d 470 (1972) (en banc); *People* v. *Skinner*, 39 Cal. 3d 765, 781, 704 P.2d 752, 217 Cal. Rptr. 685 (1985); *People* v. *Serravo*, 823 P.2d 128, 137–38 (Colo. 1992) (en banc); *State* v. *Hamann*, 285 N.W.2d 180, 183 (Iowa 1979); *State* v. *Worlock*, 117 N.J. 596, 602, 569 A.2d 1314 (1990); *State* v. *Crenshaw*, 98 Wash. 2d 789, 797–98, 659 P.2d 488 (1983). Although these courts generally have made this determination in the context of the *M'Naghten* test; see footnote 12 of this opinion; to the extent that the use of the term "wrongfulness" in the Model Penal Code can be traced back to *M'Naghten*; see footnote 14 of this opinion; the evolution of the *M'Naghten* test and the reasoning employed by courts interpreting that test inform an interpretation of our own insanity defense.[18]

do not interpret this comment, however, either as a retraction of the drafters' earlier statements or as an abandonment of the societal standard later endorsed by the chief reporter in his model jury charge. It is, in our view, more properly interpreted as a statement of a *possible*, as opposed to a *preferable*, manner in which state legislatures may choose to adopt the Model Penal Code test. We reiterate that nothing in the legislative history of § 53a-13 indicates that the legislature of this state intended that courts construe the reference to "wrongfulness" in § 53a-13 (a) in a purely personal manner.

[18] In support of the statutory interpretation he espouses, the defendant cites *United States* v. *Segna*, supra, 555 F.2d 232–33, a case in which the Court of Appeals for the Ninth Circuit concluded that the term "wrongfulness" as used in the Model Penal Code test is to be measured by a defendant's own personal moral code. Although we acknowledge that *Segna* addresses the issue currently before us, we decline to follow it. First, the *Segna* court provided virtually no support for its conclusion that the Model Penal Code

Finally, with respect to the fundamental policies that undergird our criminal law, defining the moral element of wrongfulness according to a purely personal standard tends to undermine the "moral culture on which our societal norms of behavior are based." *People* v. *Serravo*, supra, 823 P.2d 138. There may well be cases in which a defendant's delusional ideation causes him to harbor personal beliefs that so cloud his cognition as to render him incapable of recognizing the broader moral implications of his actions. In such cases, the defendant would be entitled to be acquitted under the cognitive prong of the defense.

Those cases involving the so-called "deific command," in our view, fall into this category. Contrary to the defendant's position at oral argument, we are hard pressed to envision an individual who, because of mental disease or defect, truly believes that a divine power has authorized his actions, but, at the same time, also truly believes that such actions are immoral. An individual laboring under a delusion that causes him to believe in the divine approbation of his conduct is an individual who, in all practicality, is unlikely to be able fully to appreciate the wrongfulness of that conduct. See id.,

drafters intended morality to be defined by personal standards. Although the court stated, in conclusory fashion, that "the weight of the discussions [at the annual meeting of the American Law Institute] points toward a preference" for adopting the personal standard; id., 232 n.6; we have been unable to locate any point in the discussions held at the American Law Institute's annual meeting during which its members expressed such a preference. Second, the *Segna* court also failed to provide any independent rationale for adopting the personal test. In fact, the one decision cited in support of its conclusion, *Wade* v. *United States*, 426 F.2d 64 (9th Cir. 1970) (en banc), instead explicitly states that the Model Penal Code test "essentially reflects the *moral standards and concerns of society* . . . ." (Emphasis added.) Id., 71–72 n.8. Third, we note that *Segna* was overruled legislatively by the enactment of a new federal insanity statute in 1984. See 18 U.S.C. § 17. Finally, we are aware of no other published case, either federal or state, that has adopted the *Segna* court's definition of "wrongfulness." Under these circumstances, and in light of our review of the pertinent legislative history and genealogy of this Model Penal Code provision, we reject the Ninth Circuit's holding in *Segna*.

139–40; *People* v. *Schmidt,* 216 N.Y. 324, 337, 110 N.E. 945 (1915) (if a person, because of disease or delusion, "believes that he has a command from the Almighty to kill, it is difficult to understand how such a man *can* know that it is wrong for him to do it" [emphasis in original; internal quotation marks omitted]), reh. denied, 216 N.Y. 762, 111 N.E. 1095 (1916); I Model Penal Code, supra, § 4.01, appendix C.

A defendant should not be relieved of criminal liability, however, if his mental illness does not deprive him of substantial capacity to appreciate the boundaries of societal morality and if he elects to transgress those boundaries in pursuit of a delusional personal belief system that he appreciates society would not itself accept. To permit otherwise "would seriously undermine the criminal law [by allowing] one who violated the law to be excused from criminal responsibility solely because, in his own conscience, his act was not morally wrong." *State* v. *Crenshaw,* supra, 98 Wash. 2d 797.

Accordingly, we reject the personal test as an improper method of measuring a defendant's capacity to appreciate the moral element inherent in the term "wrongfulness." Consistent with the considerations discussed above, this test is flawed because it fails to account for principles of societal morality that the Model Penal Code test incorporated, other jurisdictions have embraced, and our criminal law assumes.[19]

---

[19] For these reasons, we disagree with the formulations of the personal test set forth in the respective concurrences of Justices Berdon and Katz. In particular, we disagree with Justice Katz' assertion that, in rejecting a purely personal test, we have given "short shrift" to the intentions of the Model Penal Code drafters by denigrating the importance of the term "appreciate." The assumption upon which this assertion rests is that a deluded individual who acts in accordance with a personal code of morality may "know" that society morally would condemn his actions, but can *never* "appreciate" that moral condemnation. We reject this unsupported proposition. We acknowledge that an individual's delusion may distort his sense

In this regard, the test endorsed by the state is superior to the personal test. According to the state, a defendant can succeed under the cognitive prong of the insanity defense if he can demonstrate that, at the time of the prohibited conduct, he lacked substantial capacity to appreciate that his actions were contrary to societal morality. Although we agree with the state that the defendant's appreciation of morality must be defined in terms of his appreciation of society's moral standards; see I Model Penal Code, supra, § 4.01, appendix C, p. 214; the state's test is insufficient in one important respect. Consider, for example, a defendant who, because of a mental delusion, misperceives reality and, on the basis of that misperception, engages in criminal conduct that he believes is necessary to advance a greater social good, but who, at the same time, also appreciates that society is unaware of the need to bring about this social good and, because of this ignorance, would not condone his actions.[20] Under the state's test, such an individual would probably not be considered legally insane because he retains substantial capacity

of personal morality to the point that he no longer has the capacity to appreciate that society morally condemns his conduct. See footnote 22 of this opinion. That a particular individual may establish that he suffers from such a delusion does not mean, however, that *every* delusional individual who harbors a personal moral code also lacks the capacity to appreciate the social immorality of his actions. Rather, the question of whether a defendant's delusional moral code prevents him from appreciating the social immorality of his actions is an issue of fact to be decided on a case-by-case basis. Thus, in our view, an individual who both appreciates the social immorality of his conduct and is able, as a matter of volition, to conform his actions to the requirements of law should not be absolved from criminal responsibility, as a matter of law, upon proof that he instead acted in accordance with a divergent personal belief system.

[20] For example, a defendant might, because of a mental delusion, believe that his infant child suffers from a rare condition that will cause her to die unless she ingests certain medication that he can obtain only through theft. This hypothetical defendant might appreciate that society, objectively speaking, would disapprove of him stealing the medication but, nevertheless, may believe that, if society knew of his child's condition, it would no longer view his theft of the medication as immoral.

to appreciate that, *objectively speaking*, society does not approve of his actions.

In our view, such an approach represents an overly restrictive interpretation of what the legislature intended by choosing the term "wrongfulness" instead of the term "criminality." Representative Neiditz' statements in support of the legislation later codified at § 53a-13 indicate that "wrongfulness" was chosen in order to connote a moral element with a meaning independent of illegality. Under the state's test, however, moral wrongfulness would be measured strictly in terms of society's objective disapproval; to the extent that this objective disapproval is embodied in the criminal code, the state's test renders morality and criminality virtually synonymous.[21] We are unwilling to negate the legislature's choice of the term "wrongfulness" by treating these otherwise distinct terms as virtually identical.

We conclude, rather, that a defendant does not truly "appreciate the wrongfulness of his conduct" as stated in § 53a-13 (a) if a mental disease or defect causes him both to harbor a distorted perception of reality and to believe that, *under the circumstances as he honestly perceives them*, his actions do not offend societal morality, even though he may also be aware that society, *on the basis of the criminal code*, does not condone his actions. Thus, a defendant would be entitled to prevail under § 53a-13 (a) if, as a result of his mental disease or defect, he sincerely believes that society *would*

---

[21] Although the drafters of the Model Penal Code recognized that few cases would arise in which the distinction between wrongfulness and criminality would be determinative; see I Model Penal Code, supra, § 4.01, explanatory note, p. 164; we do not infer from this recognition that the drafters intended these terms to have identical meanings. Rather, the drafters were simply observing that, in the typical case, the trier of fact may infer that a defendant who has the capacity to appreciate the illegality of his conduct also has the capacity to appreciate its immorality. That such an inference is possible, however, does not mean that it is compelled.

approve of his conduct *if* it shared his understanding of the circumstances underlying his actions. This formulation appropriately balances the concepts of societal morality that underlie our criminal law with the concepts of moral justification that motivated the legislature's adoption of the term "wrongfulness" in our insanity statute.[22]

A jury instruction on the cognitive prong of § 53a-13 (a) should set forth this formulation as clearly as possible. The trial court should inform the jury that a person may establish that he was legally insane if he proves that, at the time he committed the prohibited conduct, due to mental disease or defect he suffered from a misperception of reality and, in acting on the basis of that misperception, he did not have the substantial capacity to appreciate that his actions were contrary to societal morality, even though he may have been aware that the conduct in question was criminal. The trial court should instruct the jury further that, in deciding whether the defendant had substantial capacity to appreciate that his conduct was contrary to societal morality, it must not limit its inquiry merely to the

---

[22] In rejecting this formulation and advocating a purely personal test, Justice Katz quotes the following hypothetical from the model jury charge contained in the Model Penal Code: "If, for example, one has such a diseased conception of his own relationship to other people that he thinks himself to be an Oriental monarch, with absolute dominion over those about him, including the privilege to deal with or to terminate their lives as he sees fit, it hardly could be thought that such a person has substantial power to appreciate that conduct of that kind is contrary to both the law and *moral standards that obtain in our community.*" (Emphasis added.) I Model Penal Code, supra, § 4.01, appendix C, p. 214. Notwithstanding Justice Katz' suggestion to the contrary, we see no reason why a person who has established that he is so profoundly mentally ill that he is incapable of even understanding societal morality necessarily would not be able to prevail under § 53a-13. This case, however, does not present such a factual scenario. Moreover, we note that the language used in the hypothetical further confirms our position that the drafters of the Model Penal Code intended the cognitive prong of the insanity defense to incorporate principles of societal morality.

defendant's appreciation that society, objectively speaking, condemned his actions. Rather, the jury should be instructed that it must also determine whether the defendant maintained a sincere belief that society would condone his actions under the circumstances as the defendant honestly perceived them. Finally, the trial court also should instruct the jury that, if it finds that the defendant had the substantial capacity to appreciate that his conduct both violated the criminal law and was contrary to society's moral standards, *even under the circumstances as he honestly perceives them,* then he should not be adjudged legally insane simply because, as a result of mental disease or defect, he elected to follow his own personal moral code.

## II

We have based our discussion thus far on a defendant who is eligible to receive a jury instruction properly defining the term "wrongfulness." One of the questions raised by this appeal, however, is whether the defendant was entitled to receive such an instruction under the facts and circumstances of this case. In answering this question, we focus our attention on two key aspects of the trial: (1) the evidence adduced by the defendant relative to his insanity defense; and (2) the jury instruction that the defendant requested regarding his insanity claim.

## A

The state contends that the defendant was not entitled to an instruction defining the term "wrongfulness" under § 53a-13 (a) because he failed to adduce sufficient evidence to support such an instruction. According to the state, the evidence submitted on the defendant's behalf did not establish, in accordance with the wrongfulness test discussed above, that his "delusion deprived him of a substantial capacity to appreciate that the [killing] of the victim was wrong under society's moral

standards." Although the state does not seriously dispute that the defendant suffered from a mental disease that caused him to misperceive reality,[23] the state claims that the evidence merely tended to show, in accordance with the purely personal standard we have rejected, that the defendant had followed his own subjective moral calculus in seeking revenge for the perceived actions of the victim and Dirk. Although the defendant primarily endorses a personal standard of morality; see part I of this opinion; he also contends that even under the societal standard that we have adopted today, the psychiatric testimony he presented was sufficient for the jury reasonably to have found that his criminal acts were committed under an honest, albeit irrational, belief that society would have condoned his actions.

We decide this issue on the basis of established legal principles. "If there is sufficient evidence of a legal defense, the defendant is entitled, as a matter of law, to a requested jury charge on that defense." *State* v. *Person*, 236 Conn. 342, 352, 673 A.2d 463 (1996). Because legal insanity is an affirmative defense for which the defendant bears the burden of proof, a defendant is entitled to receive a jury instruction on legal insanity only if he has adduced sufficient evidence from which a reasonable trier of fact could find that the defense has been established by a preponderance of the evidence. *State* v. *Joyner*, 225 Conn. 450, 471, 625 A.2d 791 (1993); see also *State* v. *Person*, supra, 353 (applying standard to affirmative defense of extreme emotional disturbance). In this case, the issue is not whether the defendant presented sufficient evidence to warrant a *general* charge on the insanity defense. The state does not contend otherwise. The issue, rather, is

---

[23] Consequently, we express no opinion regarding whether a defendant who does *not* misperceive reality would be entitled to a jury instruction defining "wrongfulness" in terms substantially similar to those that we have articulated today.

whether the defendant adduced sufficient evidence to warrant an instruction defining the term "wrongfulness" under § 53a-13 (a), as we have elucidated that term. We conclude that the defendant has met this burden.

At trial, the defense called several expert witnesses to testify regarding their examinations of the defendant and the conclusions drawn therefrom. Jay Berkowitz, a psychiatrist employed by the department of correction and working at the Bridgeport correctional center (center), testified that he had conducted a ninety minute interview and psychiatric evaluation of the defendant after the defendant's arrival at the center. Berkowitz testified that the defendant had expressed remorse for killing the victim but felt that it was something that he had to do in order to save other people. Sue Anne O'Brien, a psychiatric nurse who also worked at the center, testified that she had spoken with the defendant for approximately ninety minutes. O'Brien testified that the defendant believed that he had "saved all of us from this evil thing [that] was occurring," and she quoted the defendant as stating, " 'I saved you. I saved everyone here. I've saved the world.' "

Another expert witness, Leslie Kurt, a forensic psychiatrist, testified extensively with respect to her examination and diagnosis of the defendant, with whom she had met in a series of six interviews for a total of nearly twelve hours. Kurt stated that the defendant believed that the victim had used methamphetamine and hypnosis to gain control over people and had done nothing to prevent the intensely evil crimes of Dirk. According to Kurt, the defendant likened the victim to Sirhan Sirhan, Jim Jones and Charles Manson, and expressed a belief that he had a higher moral duty to stop the victim and Dirk. Kurt described the defendant's belief in a higher moral duty as something akin to a person believing, during World War II, that he or she had a

moral obligation to assassinate Adolf Hitler even though that person understood that this killing would be illegal.

On the basis of this testimony, we conclude that the defendant presented sufficient evidence from which a jury reasonably could have found, by a preponderance of the evidence, that, due to a mental disease or defect, the defendant misperceived reality and, in acting on the basis of that misperception, did not substantially appreciate that his actions were contrary to societal morality.[24] See *State* v. *Person*, supra, 236 Conn. 353. It is true, as the state maintains, that the defendant tried repeatedly, albeit unsuccessfully, to convince the police that the activities conducted by the victim and Dirk were dangerous and unlawful. Thus, it reasonably could be said that the defendant understood that society, unpersuaded of the danger posed by the victim, did not condone his actions. The test that we have adopted, however, requires a fact finder to look beyond the defendant's appreciation of society's objective disapproval of his actions and to inquire whether the defendant, as a result of mental disease or defect, truly

---

[21] In footnote 4 of her concurring opinion, Justice Katz suggests that, because he attempted to alert the authorities to his belief that the victim and the victim's son were plotting to destroy the world, the defendant will be unable to prevail on his insanity claim under the test that we adopt today. Notwithstanding the defendant's failure to convince the authorities to subscribe to his deluded belief, and contrary to the view expressed by Justice Katz, we see no reason why the defendant *necessarily* will be unable to establish his legal insanity in this case. As we have indicated, the defendant, under the definition of "wrongfulness" that the jury will receive on retrial, may prevail if he can establish that, due to his mental disease or defect, he substantially misperceived reality and harbored a delusional belief that society, under the circumstances as he honestly but mistakenly understood them, would not morally have condemned his actions. Consequently, it will be for the jury to determine whether the defendant, as a result of his mental illness, believed that society would not have morally condemned his conduct in light of facts as *he* perceived them. Accordingly, notwithstanding the doubts expressed by Justice Katz, this case raises factual and psychiatric issues which, if resolved by the jury in the defendant's favor, would allow him to prevail under the applicable definition of "wrongfulness."

believed that society, if it were aware of the circumstances as he honestly perceived them, would have condoned his actions.

It is also true, as the state argues, that other evidence tended to show that the defendant might not have acted in furtherance of society's moral standards at all, but was instead motivated by a desire to seek retribution for wrongs he mistakenly believed the victim and Dirk had perpetrated against him. This countervailing evidence, however, goes to the weight of the defendant's proof, and not to whether the defendant was entitled to a jury instruction correctly defining the term "wrongfulness." See *State* v. *Person,* supra, 236 Conn. 347–51; see also *State* v. *DeJesus,* 236 Conn. 189, 201, 672 A.2d 488 (1996) (trier of fact determines weight of evidence); *State* v. *Sivri,* 231 Conn. 115, 132–33, 646 A.2d 169 (1994) ("the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical" [internal quotation marks omitted]). Accordingly, we conclude that the evidence presented at trial warranted an instruction defining the term "wrongfulness" in terms of societal morality consistent with our explication of that definition in part I of this opinion.

### B

Having concluded that, as a factual matter, the evidence presented by the defendant was sufficient to support an instruction properly defining the term "wrongfulness," we next must determine whether, as a legal matter, the fact that the defendant's request to charge did not comport precisely with the standard we articulate today forecloses his claim for a new trial. A trial court is under no obligation to give a requested jury instruction that does not constitute an accurate statement of the law. See, e.g., *Holbrook* v. *Casazza,* 204 Conn. 336, 354, 528 A.2d 774 (1987), cert. denied,

484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988); see also *State* v. *Gant*, 231 Conn. 43, 47, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); *State* v. *Gabriel*, 192 Conn. 405, 418, 473 A.2d 300 (1984). At oral argument, we raised the question, sua sponte, whether the defendant's requested instruction was legally inaccurate in that it did not address the societal standard for measuring a defendant's appreciation of morality. Although the requested instruction failed to encompass fully principles of societal morality that we conclude are embodied in the cognitive prong of the insanity defense, we nevertheless are persuaded that, under the circumstances of this case, the defendant should not be penalized for this failure.

The defendant timely requested that the trial court instruct the jury that, under the cognitive prong of § 53a-13 (a), "an accused is not criminally responsible for his offending act if, because of mental disease or defect, he believes that he is morally justified in his conduct— even though he may appreciate that his act is criminal. A defendant lacks substantial capacity to appreciate the wrongfulness of his conduct if he knows his act to be criminal but commits it because of a delusion that it is morally justified. Thus, if you find that the defendant, at the time of the offense, suffered from a delusion rendering his act morally justified in his mind, he has established the affirmative defense and you must return a verdict of not guilty by reason of lack of capacity due to mental disease or defect." The trial court refused to give this instruction and, although the court sought to explain the meaning of the term "wrongfulness," it did so without addressing the issue of moral justification. See footnote 10 of this opinion.

Although the defendant challenges the trial court's refusal to grant his requested instruction, he does not contend that the requested instruction explicitly

addresses the concept of societal morality that, we have concluded, forms an integral part of the definition of "wrongfulness." The defendant contends, rather, that the requested instruction replicates the legislative history of § 53a-13 and, therefore, implicitly adopts whatever standard the legislature intended that statutory provision to incorporate. We agree with the defendant that the operative language of the requested instruction is similar to that used by Representative Neiditz in support of the public act now codified at § 53a-13. See 12 H.R. Proc., supra, p. 2585, remarks of Representative Neiditz (wrongfulness chosen over criminality to accommodate defendant who believes his conduct "to be morally justified"). We have never held, however, that substantial reproduction of legislative history, without more, is sufficient to constitute an accurate statement of the law, and decline to do so today.

The defendant's failure to proffer a request to charge that fully articulated the applicable law[25] ordinarily would preclude him from attacking any insufficiency or inaccuracy in the charge actually given by the trial court. See *State* v. *Chetcuti*, 173 Conn. 165, 170–71, 377 A.2d 263 (1977); *State* v. *Green*, 172 Conn. 22, 25, 372 A.2d 133 (1976). Although we reaffirm the general appli-

---

[25] In part II of her concurrence, Justice Katz states that the request to charge "clearly references a *personal* concept of moral justification." (Emphasis in original.) She bases this conclusion on an isolated statement in the request to charge to the effect that the defendant could prevail if he believed his conduct was "morally justified in his mind." We recognize that the phrase "in his mind," standing on its own, may render the request to charge susceptible to such an interpretation. We conclude, however, that this phrase, when considered in the context of the entire request to charge, is ambiguous with respect to whether moral justification should be measured in purely personal as opposed to societal terms. The thrust of the requested instruction was that the defendant was not criminally responsible if he believed his actions were morally justified. It is reasonable to construe the phrase "in his mind" as serving to emphasize the uncontroversial point that an inquiry into this belief must be conducted from the point of view of the defendant's delusional mind.

cability of this rule, we are persuaded that, for two overriding reasons, principles of fundamental fairness militate against its strict application under the unique circumstances of this case. First, the defendant's requested instruction was correct in a fundamental and important respect: it attempted to link the definition of "wrongfulness" to concepts of moral justification. Because there is no dispute in this case that a moral element inheres in the definition of "wrongfulness"; see 12 H.R. Proc., supra, p. 2585, remarks of Representative Neiditz; the defendant was, at the least, entitled to an instruction explaining the relationship between wrongfulness and morality under § 53a-13. Second, we recognize that the standard for measuring a defendant's appreciation of morality is not explicit either on the face of the statute or in its legislative history. Although we have explicated that standard in light of the Model Penal Code and the jurisprudential concerns expressed therein, we decline to penalize the defendant for having failed to have anticipated our holding in this case.[26] Accordingly, we conclude that, having submitted evidence sufficient to support an instruction defining wrongfulness in accordance with the standard set forth in part I of this opinion, the defendant was not disqualified from receiving such an instruction on the basis of his request to charge.

### III

Finally, we must decide whether the fact that the defendant did not receive an instruction properly defining the term "wrongfulness" constituted harmful error.

---

[26] For the same reason, we do not fault the trial court for failing to forecast the standard set forth in part I of this opinion. To the extent that an instructional error occurred in this case, that error flowed not from an incomplete or insufficient definition of morality but, rather, from the omission of a more basic instruction defining wrongfulness in terms of morality. This more basic instruction was supported by the request to charge and the legislative history upon which it relied.

Because an instructional omission with respect to an affirmative defense such as legal insanity does not rise to the level of a constitutional violation; see *State* v. *Foreshaw*, 214 Conn. 540, 546, 572 A.2d 1006 (1990); *State* v. *Preyer*, 198 Conn. 190, 196–97, 502 A.2d 858 (1985); the defendant bears the burden of persuasion, on appeal, that "it is more probable than not that [the instructional omission] affected the result of the trial." *State* v. *Esposito*, 235 Conn. 802, 825, 670 A.2d 301 (1996). We conclude that the defendant has satisfied this burden.

It is undisputed that the insanity defense instruction given in this case neither defined "wrongfulness" in terms of morality nor defined morality in relation to the defendant's appreciation of societal morals. These omissions went to the heart of the defendant's affirmative defense. The primary issue at trial was whether the defendant had satisfied the standards for legal insanity under § 53a-13 (a). Specifically, the defendant's case focused largely on establishing that, although the defendant may have understood the illegality or criminality of his action, he did not truly appreciate its wrongfulness because he honestly believed that he was acting in furtherance of societal morality. See part II A of this opinion; compare *State* v. *Thurman*, 10 Conn. App. 302, 321, 523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 1152 (1987) (failure to instruct on wrongfulness constitutes harmless error because defendant did not produce evidence of perceived moral justification). Because the defendant's appreciation of the criminal law was not at issue, the success of his defense *hinged* on whether the jury found that, at the time of the killing, he appreciated the *immorality* of his actions. As a result, because the jury was not instructed that it could consider principles of morality in determining whether the defendant appreciated the wrongfulness of his actions, the instruc-

tion given to the jury did not sufficiently address the defendant's principal defense.[27]

The state contends that regardless of the "possible confusion" engendered by the failure to define "wrongfulness" in terms of morality, the defendant's closing arguments, taken together with the evidence presented, would have "guided the jury to a proper understanding of the word 'wrongfulness' in relation to morality." We are unpersuaded. Although the defendant argued to the jury that he did not appreciate the moral wrongfulness of his actions because he believed that society would have approved of them, and although he adduced evidence to support this proposition, we must presume that the jury followed the instructions of the trial court, rather than the argument of the defendant, with respect to the meaning of the term "wrongfulness." See *State v. Just*, 185 Conn. 339, 357, 441 A.2d 98 (1981). Because the meaning of wrongfulness under § 53a-13 (a) was left unclear and because that lack of clarity affected a central element of the defendant's claim of insanity, we conclude that the trial court's failure to define "wrongfulness" in terms of the defendant's appreciation of societal morality constituted harmful error.

The judgment is reversed and the case is remanded for a new trial.

In this opinion BORDEN, NORCOTT and PETERS, Js., concurred.

---

[27] This fact becomes more evident when the instruction under the cognitive prong of § 53a-13 (a) is considered in its broader context. Immediately after instructing the jury with regard to the cognitive prong, the trial court instructed them that, under the statute's volitional prong, a person is relieved of "criminal liability if his mental disease or defect results in a lack of substantial capacity to keep his conduct *within the requirements of the law even though he may appreciate [its] wrongfulness.* . . . It is only when he lacked substantial capacity to keep his conduct under control, and thus keep it within the *requirements of the law,* that this part of the affirmative defense excuses him from criminal liability." (Emphasis added.) In the absence of any further explication of the term "wrongfulness" under the

BERDON, J., concurring in the result. I agree with the result reached by the majority, but I disagree with the standard established for a defendant to prove that he or she failed "to appreciate the wrongfulness of his [or her] conduct," in order to satisfy the cognitive prong of the insanity defense under General Statutes § 53a-13. Although I agree generally with part I of the concurring opinion of Justice Katz, with respect to her interpretation of § 53a-13, I write separately because I reach that result through a slightly different route.

The majority poses what it terms as the difficult question of "how properly to define the moral element inherent in the term 'wrongfulness' under § 53a-13 (a)." The legislature clearly answered this so-called difficult question in 1967 when it adopted § 4.01 of the American Law Institute's Model Penal Code (Model Penal Code), now codified at § 53a-13 (a). When the legislature adopted the American Law Institute's test, it also chose the alternate phrasing offered by the Model Penal Code—"wrongfulness" instead of "criminality." At the time that the legislature adopted this standard, Representative David H. Neiditz, the sponsor of the bill, explained: "*[T]he wording that was adopted before us now is the exact formulation as used in* [*United States* v. *Freeman*, 357 F.2d 606 (2d Cir. 1966)] . . . . [W]hen the American Law Institute made this formulation, they interchangeably [used] two words, in section one, they referred to 'the substantial capacity either to appreciate the criminality or the wrongfulness of his conduct,' they allowed for either use . . . . *The Freeman case adopted the word 'wrongfulness' for the reason that [it would] include the case where the perpetrator appreciates that his conduct is criminal but because of [his delusion] believes it to be morally justified. I think it's the better formula* and most of the other states that have adopted

cognitive prong, it is reasonable to assume that the jury would have inferred from this instruction that wrongfulness was somehow related to "the requirements of the law."

have used the word 'wrongfulness.' In addition . . . I think it's important that we have the uniformity with our own federal courts and lastly, I think the reason we should change [the] law in this area . . . is so as not to leave the decision to a particular judge sitting on a particular case. I think that we have developed the uniformity and I firmly believe that with certain legislation now before the Congress involving a 'not guilty by reason of insanity' plea that most of the federal courts, throughout the country, will adopt the Model Penal Code rule as the [Second] Circuit has in . . . [t]he *Freeman* case." (Emphasis added.) 12 H.R. Proc., Pt. 6, 1967 Sess., p. 2585.

Turning to *Freeman*, it is clear that that case formulated a "subjective" test in order to define the term "wrongfulness" encompassed within the test that it was judicially adopting from § 4.01 of the Model Penal Code. Specifically, the court in *Freeman* stated that "[w]e have adopted the word 'wrongfulness' in Section 4.01 as the American Law Institute's suggested alternative to 'criminality' *because we wish to include the case where the perpetrator appreciates that his conduct is criminal, but, because of a delusion, believes it to be morally justified.*"[1] (Emphasis added.) *United States*

---

[1] The majority responds to this concurrence; see footnote 15 of the majority opinion; by asserting that *Freeman* does not answer the central issue raised in this appeal because it does not address whose morals are encompassed within the term "morally justified." The majority continues this reasoning in footnote 16 by stating that it is not clear from Representative Neiditz' remarks whether the phrase "morally justified" was intended to mean according to the defendant's own personal morals. Again, the plain language in *Freeman* indicates that the court chose the term "wrongfulness" in order to include the situation "where the perpetrator appreciates that *his conduct* is criminal, but, *because of a delusion*, believes [his conduct] to be *morally justified*." (Emphasis added.) *United States* v. *Freeman*, supra, 357 F.2d 622 n.52. The moral justification referred to in *Freeman* must be that of the defendant, otherwise it would not make sense. I am baffled by the majority's assertion that Representative Neiditz' remarks, based upon *Freeman*, were not clear that "morally justified" refers to the defendant's viewpoint.

v. *Freeman,* supra, 357 F.2d 622 n.52.; see also *United States* v. *Segna,* 555 F.2d 226, 233 (9th Cir. 1977) (with standard indistinguishable from *Freeman,* indicating that Ninth Circuit had previously adopted word "wrongfulness" from American Law Institute's test because "[i]n [the court's view], use of the word wrongfulness in the test of legal insanity would exclude from the criminally responsible category those who, knowing an act to be criminal, committed it because of a delusion that the act was morally justified" [internal quotation marks omitted]);[2] I A.L.I., Model Penal Code and Commentaries (1985), § 4.01, comment, pp. 178–79 (revised comments looking back at developing case law and indicating that "[m]ost federal courts of appeals have adopted a wrongfulness standard, with one leading case [*Freeman*] clearly indicating that an actor may be excused who, because of a delusion, believes what he is doing is morally right even though he knows it is criminal and condemned by society").

We have long held that we interpret our statutes in part based upon their legislative history. Statutory interpretation "is guided by well established principles of statutory construction. Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal

---

[2] In *Wade* v. *United States,* 426 F.2d 64, 71–72 & n.9 (9th Cir. 1970), the Ninth Circuit had previously adopted the word "wrongfulness" in order to be in line with the standard in cases such as *Freeman* and, in fact, *Wade* cites to *Freeman. Segna* later reaffirmed the position taken in *Wade. United States* v. *Segna,* supra, 555 F.2d 232–33.

quotation marks omitted.) *State* v. *Burns*, 236 Conn. 18, 22–23, 670 A.2d 851 (1996). The majority, at the very beginning of part I of its opinion, pays homage to this fundamental principle, yet it glosses over the definitive legislative statements that expressly illustrate that the legislative intent was to incorporate by reference the subjective standard, defining the word wrongfulness, as formulated in *Freeman*. In my view, therefore, *Freeman* is dispositive of the issue in this case and the standard set forth in the majority opinion overrides the legislature's unequivocally expressed intent.

KATZ, J., concurring. "No aspect of the criminal justice system is more controversial than is the insanity defense. Nowhere else does the successful employment of a defense regularly bring about cries for its abolition; no other aspect of the criminal law inspires position papers from trade associations spanning the full range of professional and political entities. When the defense is successful in a high-level publicity case (especially when it involves a defendant whose 'factual guilt' is clear), the acquittal triggers public outrage and serves vividly as a screen upon which each relevant interest group can project its fears and concerns." M. Perlin, The Jurisprudence of the Insanity Defense (1994) p. 3. It would serve this court well to bear these thoughts in mind as we navigate the ever murkier waters of insanity jurisprudence in our attempt to set forth a standard for criminal responsibility that readily may be understood and applied by our courts and juries and that is also fair to the defendant who seeks to invoke its protection.

I concur in the result reached by the majority, and applaud what is obviously a carefully considered and thoughtfully drafted exegesis of the standard set forth in the American Law Institute's Model Penal Code as incorporated by General Statutes § 53a-13. I am concerned, nonetheless, that the test as interpreted by the

majority may exclude certain defendants who are obviously impaired and for whom the interests of justice would not be served by a criminal conviction; specifically, those defendants who, *because of their mental illness*, adhere to a personal code of morality.

Because the test established by the majority unjustifiably withholds the insanity defense from certain mentally ill defendants who, I believe, should not be held criminally responsible for their actions, I am unable to agree with the majority's adoption of that test. Moreover, apart from my conclusion that the test embraced by the majority is too restrictive, I must confess that I am perplexed by the majority's conclusion that, given that test, the defendant is entitled to a new trial.

I

In declaring that a defendant whose mental illness does not deprive him of the substantial capacity to appreciate social boundaries yet who nonetheless chooses to transgress those boundaries must be held criminally responsible, the majority seeks to exclude those otherwise sane individuals who would use the insanity defense as a shield when seeking to satisfy personal grudges or to impose personal political beliefs, a goal I wholeheartedly share. I disagree with the majority, however, that the defense should not apply to an individual who is mentally ill and *because of that illness* believes that society's rules do not apply to his or her actions. It is my belief that such a person is not *capable* of *appreciating* the legal and social import of his or her acts, and, therefore, should not be held criminally responsible.

Societal morals are reflected by the criminal code. "Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that . . . it is also condemned as an offense against good morals." *People* v. *Schmidt*, 216 N.Y. 324, 340, 110 N.E. 945 (1915).

Because murder is an offense against good morals, it has been made a crime. The test adopted by the court today attempts to create a distinction between issues of legality and morality, but by focusing on a societal standard it has, I believe, conflated the two in much the same way as does the state in its test, which this court has properly rejected.

The majority has determined that under the Model Penal Code, a defendant who "appreciates"[1] that society would not approve of his or her actions cannot invoke the insanity defense, even though that defendant is mentally ill and has acted under a delusional adherence to a personal moral code. I fail to understand the majority's reasoning, however, in light of statements by Herbert Wechsler, the chief reporter for the Model Penal Code, in which he clarifies what it means to "appreciate" the wrongfulness of one's actions. The majority cites to Wechsler's model jury instructions, which provide: "To appreciate the wrongfulness of conduct is, in short, to realize that it is wrong; to understand the idea as a matter of importance and reality; *to grasp it in a way that makes it meaningful to the life of the individual*, not as a bare abstraction put in words." (Emphasis added.) I A.L.I., Model Penal Code and Commentaries (1985) § 4.01, appendix C, p. 215 (hereinafter Model Penal Code). Although recognizing that a defendant's personal moral code may be delusional, the majority underestimates the pivotal role of that defendant's men-

---

[1] Throughout the majority opinion, the legislative history of § 53a-13 and the decision in *United States* v. *Freeman*, 357 F.2d 606 (2d Cir. 1966), the word "appreciate" has been used very loosely. A close reading of the comments to the Model Penal Code and of the model jury instruction of Herbert Wechsler, the chief reporter for the Model Penal Code; see I A.L.I., Model Penal Code and Commentaries (1985) § 4.01, appendix C, p. 215; convinces me that in most of the instances in which the majority has used "appreciate," it more properly should have used "know" or "understand." It is clear that the Model Penal Code test hinges on the matter of the defendant's *appreciation* of the quality of his or her actions.

tal illness. In other words, if the defendant's personal code is the *direct result* of the mental illness, then I am hard-pressed to understand how that defendant's knowledge of society's disapproval could be "a matter of importance and reality . . . meaningful in the life of the [defendant] . . . ." Id. I believe that such a defendant is unable to truly appreciate, as defined by Wechsler, the "wrongfulness" of his or her action. Nor am I alone in that belief—I need go no further than the aforementioned model jury instructions.

The majority cites to the model jury instructions in the Model Penal Code in support of its conclusion that "wrongfulness" incorporates societal standards. Reading one sentence further, however, I note that Wechsler provides the jury with an example of a defendant who cannot appreciate the wrongfulness of his actions: "If, for example, one has such a diseased conception of his own relationship to other people that he thinks himself to be an Oriental monarch, with absolute dominion over those about him, including the privilege to deal with or to terminate their lives as he sees fit, it hardly could be thought that such a person has substantial power to appreciate that conduct of that kind is contrary to both the law and moral standards that obtain in our community." Id., p. 214. This, I would argue, is *precisely* the person to whom the majority refers when it describes that individual who adheres to a "personal, albeit delusional, moral code."

Those same instructions, in a passage immediately following a passage extracted by the majority, describe "[a] person . . . who is so far disoriented by disease that he is incapable of any feeling for the other people in the world or of realizing their existence and importance, or of distinguishing between his own identity and theirs, such a person might be deemed to be without significant capacity to appreciate that it is wrong to kill another man, although he says he knows that it is

wrong." I Model Penal Code, supra, § 4.01, appendix C, p. 215. Again, this describes a defendant who, *as a result of mental illness*, believes himself removed from the mores of society.

I find further support for my interpretation in the analysis employed by the Second Circuit Court of Appeals in *United States* v. *Freeman*, 357 F.2d 606 (2d Cir. 1966). In that case, the court sought to adopt a test that was "in harmony with modern medical science"; id., 622; and by which "an inquiry based on meaningful psychological concepts can be pursued." Id., 623. The court was *not* concerned with deciding whether the defendant should be held criminally responsible for his acts but, rather, sought only to determine whether that circuit should adopt a new test for criminal responsibility. Id., 615. The court recognized that such a test was necessary because "none of the three asserted purposes of the criminal law—rehabilitation, deterrence and retribution—is satisfied when the truly irresponsible . . . are punished"; id.; and for that reason adopted a test that required a defendant to truly *appreciate* the import of his or her actions before he or she could be held responsible. Id., 622. In other words, "mere intellectual awareness that conduct is wrongful, when divorced from appreciation or understanding of the moral or legal import of behavior, can have little significance [in establishing responsibility]." Id., 623. I believe that the majority has given this aspect of *Freeman* and the Model Penal Code test short shrift when it assumes, a priori, that there can exist a defendant who, *because of a mental disease or defect*, adheres to a personal code of morality, yet is capable of not just an intellectual awareness of societal norms but *fully appreciates* those norms. If an individual is so disturbed that he or she honestly believes in the moral justification of his or her

actions by *any* standard, how can we say that he or she can appreciate the wrongfulness of those actions?[2]

A careful reading of *Freeman* and its progeny, as well as of the state cases that deal with the distinction between criminality and wrongfulness, makes it clear that those courts were concerned with the mentally disturbed defendant who has a mere intellectual awareness of society's mores but who fails to *appreciate* how those mores apply to him—in other words, the mentally disturbed defendant who follows a personal code because it is the only code that is "a matter of importance and reality . . . meaningful in [his] life . . . ."[3] I Model Penal Code, supra, § 4.01 (1), appendix C, p. 215. Therefore, the focus in those opinions on the distinction between personal and societal concepts of morality was less precise than anyone currently struggling with this issue would like. In light of my concerns, I am therefore unable to agree with the test adopted by the majority, a test that excludes a defendant who, because of a mental disease or defect, is guided by a personal sense of morality.[4]

---

[2] In footnote 19 of its opinion, the majority misperceives the personal test as I would formulate it. I am concerned with the defendant who: (1) suffers from a mental disease or defect; and (2) *knows* that society would condemn his action under any set of facts; but (3) is unable, because of his mental illness, to *appreciate* that societal condemnation. I agree with the majority that an individual who is mentally ill and who, although ill, is yet able to fully *appreciate* societal morality, should be held criminally responsible for his or her illegal acts, absent a claim of lack of volition. Where we differ, however, is that I consider that, as a matter of law, an individual who, as a result of his or her mental illness, believes that his or her personal moral code allows him or her to act against societal mores *cannot* appreciate that societal condemnation and, therefore, cannot be held criminally responsible.

[3] The drafters of the Model Penal Code itself were also concerned with this distinction. As the majority acknowledges, the drafters of the Model Penal Code adopted the term "appreciate" in order to extend the coverage of the defense to those defendants who had only a "detached or abstract awareness" of the wrongfulness of his conduct "that does not penetrate to the affective level." I Model Penal Code, supra, § 4.01 (1), comment, p. 166.

[4] Indeed, I wonder whether this particular defendant could meet the requirements of the majority's test and could convince a jury that society,

## II

The majority has acknowledged, as it must, that it is the law in this state that a defendant is not entitled to a jury instruction that is not an accurate statement of the law. See *State* v. *Pinnock*, 220 Conn. 765, 788, 601 A.2d 521 (1992); *State* v. *Gabriel*, 192 Conn. 405, 418, 473 A.2d 300 (1984); *State* v. *Chetcuti*, 173 Conn. 165, 171, 377 A.2d 263 (1977); *State* v. *Green*, 172 Conn. 22, 25, 372 A.2d 133 (1976); *State* v. *Brown*, 163 Conn. 52, 60, 301 A.2d 547 (1972); *State* v. *Harrison*, 32 Conn. App. 687, 694, 631 A.2d 324, cert. denied, 227 Conn. 932, 632 A.2d 708 (1993). The majority avoids reaching that conclusion in the present case, however, by determining that the charge requested by the defendant was not an inaccurate statement of the law but, rather, merely was incomplete. The majority finds, therefore, that although the requested instruction did not *fully* articulate the applicable law, it nevertheless correctly linked "wrongfulness" with morality, and was thus sufficient.

If it were truly the case that the defendant had merely requested a charge that was incomplete, I would be more inclined to agree with the majority's conclusion that he is entitled to a charge "explaining the relation-

knowing what he believed, would have approved of his actions. In this case, the defendant did everything in his control to notify law enforcement authorities, as well as other members of society, of the facts about the victim as he believed them, and society, knowing what the defendant believed, nevertheless declined to act. How, then, could the defendant argue that society would approve of his conduct? Even if the defendant were to claim that society failed to act only because it did not believe him, the defendant nevertheless has acted in the face of society's disapproval. Rather than interpreting society's reaction as a signal that he may be wrong in his assumptions about the victim and his justification for his actions, he has assumed that society is wrong for not believing him. As I interpret the majority's test, under these circumstances, this defendant, deluded as he may be, cannot claim insanity as a defense. Contrary to the majority's position that these circumstances raise a jury issue; see footnote 24 of the majority opinion; I believe that these circumstances, under the majority's test, preclude the jury's consideration of the insanity defense.

ship between wrongfulness and morality under § 53a-13." See *State* v. *Thurman*, 10 Conn. App. 302, 321, 523 A.2d 891, cert. denied, 204 Conn. 805, 528 A.2d 1152 (1987) ("The meaning of the word 'wrongfulness' . . . is subject to varying interpretations. . . . [T]he trial court must, when properly requested, provide this definition . . . if 'the record contains evidentiary support for the defendant's theory that, although he realized the offending act was illegal, because of mental disease he possessed a false belief that the act was morally justified.' " [Citations omitted.]). The court in *Thurman* considered a jury charge that defined wrongfulness as moral wrongfulness and that informed the jury that if it found " 'that the defendant, because of a mental disease or defect, lacked substantial capacity to appreciate the wrongfulness of his conduct even if he knows his conduct to be criminal but so commits it because of a delusion that he was morally justified, then [its] verdict must be not guilty.' " Id., 318 n.15.[5] This charge, I believe, is an example of a charge that, under the test as established by the majority today, would be incomplete but nevertheless sufficient to support on retrial an instruction more fully articulating the appropriate test. This charge is not, however, the charge requested by the defendant in the present case.

There is a fundamental difference between the charge discussed in *Thurman* and the charge requested by the defendant in the present case. The defendant here requested a charge that absolved him of criminal responsibility if the jury found that he "at the time of the offense, suffered from a delusion rendering his act morally justified *in his mind* . . . ." (Emphasis added.) Such a request clearly references a *personal* concept of moral justification, a concept that explicitly has been rejected by the majority in today's decision.

---

[5] The court in *Thurman* ultimately determined that the record did not support the requested charge. *State* v. *Thurman*, supra, 10 Conn. App. 321.

The requested instruction more closely resembles the broader test I propose in part I of this opinion. Under these circumstances, I am unable, therefore, to agree with the majority's conclusion that the defendant is entitled to a new trial based on the trial court's refusal to give the requested instruction, because I believe that that conclusion cannot logically be drawn from the law of criminal responsibility as articulated by the court today.

MCDONALD, J., dissenting. The jury heard evidence that the defendant prepared for this homicide by legally purchasing a handgun after a waiting period. On the day of the homicide, he visited his mother's grave to apologize for what he was going to do, and then drove to the home of the victim. There, the defendant found the victim in his swimming pool where the defendant repeatedly shot him. The defendant then drove to the local police station, locked his gun in the trunk of his automobile and turned himself over to the police.

At his trial, the defendant raised the defense of insanity, claiming he was thereby fixated to destroy the victim because the victim was evil.

I

The majority reverses the defendant's conviction of murder and orders a new trial because of the trial judge's charge to the jury. The defendant did file a request to charge which the trial judge refused to give. The instruction requested by the defendant read as follows: "[A]n accused is not criminally responsible for his offending act if, because of mental disease or defect, he believes that he is morally justified in his conduct—even though he may appreciate that his act is criminal."

The requested charge swept away any consideration of an objective moral standard. It incorporated a per-

sonal and subjective standard of moral wrong rather than a societal standard. It did not clearly state that as related to the homicide, wrong refers to the defendant's cognitive inability due to mental disease or defect to distinguish right from wrong as measured by a societal standard of morality. The request, rather, referred to the defendant's purely personal standard of morality.

In *People* v. *Serravo*, 823 P.2d 128, 138 (Colo. 1992), the Supreme Court of Colorado recognized that a request to charge cast in terms similar to those requested by the defendant could have been interpreted by the jury to incorporate a personal and subjective standard of moral wrong rather than a societal standard of right and wrong.[1] That court disapproved of such an instruction because it failed to "expressly inform the jury that [wrong] does not refer to a purely personal and subjective standard of morality." Id., 139. I believe the trial court properly refused the defendant's request.

## II

In ordering a new trial, the majority states that the defendant was not disqualified from receiving an instruction that he may be excused from criminal liability if because of a mental defect he believed in some nonobjective sense that his conduct, though knowingly illegal, was not against society's standards of morality. No such request, however, was made to the trial judge whom we now reverse.

Furthermore, not once in its charge did the trial court state that the defendant would be criminally liable if he knew his acts were against the criminal law. The jury instruction did allow the jury to measure wrongfulness by its common and understood meaning of morally wrong. Id., 137–38; see also *State* v. *Corley*, 108

[1] The court in *People* v. *Serravo*, supra, 823 P.2d 138, also pointed out that, as in this case, the penal laws against murder practically mirror society's view.

Ariz. 240, 243, 495 P.2d 470 (1972); *People* v. *Skinner*, 39 Cal. 3d 765, 780–81, 704 P.2d 752, 217 Cal. Rptr. 685 (1985); *Moses* v. *State*, 245 Ga. 180, 184, 263 S.E.2d 916 (1980); *People* v. *Wood*, 12 N.Y.2d 69, 76–77, 187 N.E.2d 116, 236 N.Y.S.2d 44 (1962). An average juror would understand without difficulty that wrong is a bedrock moral term. It is defined as "something . . . immoral." Webster's Third New International Dictionary. That wrong and right are moral terms was pointed out by another famous Connecticut author. Although not a psychiatrist, Samuel Clemens simply stated: "Always do right. This will gratify some people and astonish the rest." J. Bartlett, Familiar Quotations (16th Ed. 1992) p. 528, quoting from a card sent by S. Clemens to the Young People's Society, Greenpoint Presbyterian Church, Brooklyn, New York, on February 16, 1901.

We break new ground to say this trial judge should be reversed because he failed to honor a defective request to charge, and because he, the defendant and the state all failed to anticipate that we would use this case in uniquely redefining the insanity defense. This is not in keeping with our role as an appellate court as demonstrated by our cases through the years. See *Keating* v. *New London*, 104 Conn. 528, 534, 133 A. 586 (1926); see also, e.g., *State* v. *Payne*, 240 Conn. 766, 781, 695 A.2d 525 (1997); *State* v. *Gant*, 231 Conn. 43, 48, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); *State* v. *Watlington*, 216 Conn. 188, 198, 579 A.2d 490 (1990).

### III

The majority now approves a jury instruction that provides a definition of wrong as something against societal morality, but not objectively speaking. The majority approves this language: "[I]n deciding whether the defendant had substantial capacity to appreciate

that his conduct was contrary to societal morality, [the jury] must not limit its inquiry merely to the defendant's appreciation that society, objectively speaking, condemned his actions. Rather, the jury must also determine whether the defendant maintained a sincere belief that society would condone his actions under the circumstances as the defendant honestly perceived them." Under this formula, a person who knows murder is wrong in the eyes of society and knows society does not share his perception that his victim needs to be killed may be excused if he believes, because of mental illness, that society would condone the killing if it, too, saw that need. This should not be written into our law. If the defendant recognizes his conduct is both criminal and wrong in the eyes of society, as murder clearly is; see footnote 1 of this dissent; public safety demands that he be held responsible for his actions. I do not agree that it should be a defense that the defendant believes society did not approve of his conduct only because society failed to appreciate a needed "greater social good" which would come from those same actions.

It is hoped that we can still rely on the common sense of jurors, coping with these enigmatic instructions, to safeguard us.

Accordingly, I respectfully dissent.