## IN RE DARIEN S.*
### (AC 23748)

West, McLachlan and Peters, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the name of the juvenile involved in this appeal is not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued December 5, 2003—officially released March 23, 2004

*James J. Connolly*, supervisory assistant public defender, for the appellant (respondent).

*Michael Besso*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney

general, and *Susan T. Pearlman* and *Sonia S. Stoloff*, assistant attorneys general, for the appellee (petitioner).

*Opinion*

PETERS, J. After a juvenile has been committed as a delinquent to the custody of the commissioner of children and families (commissioner), he has a statutory right to a hearing on a permanency plan for his future placement. General Statutes § 46b-141 (b) and (c). The principal issue in this case is whether, at such a hearing, the commissioner is required to make an evidentiary showing of a compelling need for the juvenile's continued commitment before the expiration of his term of commitment. The trial court held that the statute did not include such a requirement. We affirm the court's judgment in favor of the commissioner.

As required by General Statutes § 46b-141 (d),[1] the commissioner initiated the present proceeding by filing a permanency plan for the respondent juvenile, Darien S. (juvenile). The stated purpose of the permanency

[1] General Statutes § 46b-141 (d) provides: "At least sixty days prior to each permanency hearing required pursuant to subsection (b) or (c) of this section, the Commissioner of Children and Families shall file a permanency plan with the court. At each permanency hearing, the court shall review and approve a permanency plan that is in the best interest of the child and takes into consideration the child's need for permanency. Such permanency plan may include the goal of: (1) Revocation of commitment and placement of the child with the parent or guardian, (2) transfer of guardianship, (3) permanent placement with a relative, (4) adoption, or (5) such other planned permanent living arrangement ordered by the court, provided the Commissioner of Children and Families has documented a compelling reason why it would not be in the best interest of the child for the permanency plan to include the goals in subdivisions (1) to (4), inclusive, of this subsection. Such other planned permanent living arrangement may include, but not be limited to, placement of the child in an independent living program. At any such permanency hearing, the court shall also determine whether the Commissioner of Children and Families has made reasonable efforts to achieve the permanency plan."

plan was "[r]eunification of the [juvenile] with [his mother]."

On September 4, 2002, the trial court held a hearing, at which the juvenile was represented by counsel, to review the permanency plan. After determining that the permanency plan was in the best interest of the juvenile, the court approved its "goal of revocation of commitment and placement of the [juvenile] with the mother . . . ." The juvenile has appealed from that judgment.

The underlying facts are undisputed. The juvenile was first committed to the custody of the commissioner on September 28, 2001, as a result of his conviction as a delinquent for violation of a court order, interference with a police officer and assault of a police officer. His subsequent conviction for assault on commission personnel led to the extension of his commitment until October 16, 2003.

The juvenile raises three issues in his appeal from the trial court's approval of the commissioner's permanency plan. He claims that the court (1) misconstrued § 46b-141 (d) in holding that the permanency plan hearing did not require the commissioner to show a compelling need for his continued commitment until the expiration of his term of commitment, (2) mischaracterized the permanency plan goal that was submitted by the commissioner and thereby relieved the commissioner of her greater burden of proving the validity of the permanency plan under § 46b-141 (d) (5) and, (3) violated his federal and state constitutional rights to due process by denying him a plenary hearing at which he could present evidence, and confront and cross-examine the state's witnesses.

Because each of the juvenile's claims involves questions of law, our review is plenary. See *In re Haley B.*, 262 Conn. 406, 411, 815 A.2d 113 (2003). We agree with the judgment of the trial court.

## I

## MOOTNESS

As a threshold matter, we must decide whether intervening events have caused the juvenile's appeal to become moot.[2] We lack subject matter jurisdiction to consider the merits of a moot case. *Loisel* v. *Rowe*, 233 Conn. 370, 377–78, 660 A.2d 323 (1995).

The issue of mootness arises out of the fact that, on October 16, 2003, during the pendency of this appeal, the juvenile's commitment expired. As a result, the commissioner no longer has any jurisdiction over him. It follows, as the parties concede, that this court's judgment cannot affect the rights of this juvenile.

The parties argue, however, that we should nevertheless consider this appeal on its merits because the juvenile's claims fall under the "capable of repetition, yet evading review" exception to the mootness doctrine. We agree.

An otherwise moot question may qualify for review under the "capable of repetition, yet evading review" exception if the appeal meets three requirements recently reiterated by our Supreme Court in *In re Steven M.*, 264 Conn. 747, 826 A.2d 156 (2003). These requirements are that similar actions in the future (1) will encounter similar time constraints precluding appellate review, (2) will affect a group of similar complainants for whom this litigant may reasonably serve as a surrogate and (3) will similarly raise a question of public importance. *Loisel* v. *Rowe*, supra, 233 Conn. 382. In *In re Steven M.*, the court found that these requirements had been met by a juvenile challenging the validity of his transfer to the commissioner of correction at a time when the juvenile was no longer in custody. *In re Steven M.*, supra, 755–56. These precedents govern this case.

---

[2] This issue was raised sua sponte by this court prior to oral argument.

We may proceed, therefore, to an examination of the merits of the juvenile's appeal in light of the applicable statutory law. Because a juvenile delinquent has no common-law right to a permanency plan, this appeal is governed solely by the enactments of our legislature unless these statutes are constitutionally defective.

## II

## HISTORY OF PERMANENCY PLANS

The juvenile's principal claim on appeal is that the obligation to present a permanency plan for judicial approval inherently encompasses the obligation to establish the necessity for a juvenile's continued commitment to the commissioner. In his view, such an obligation is implicit in the text of § 46b-141 (d). The validity of this assertion raises a question of first impression. We know of no Connecticut case, and the parties have cited none, that discusses the constituent elements of a permanency plan for a *juvenile delinquent*.[3]

Because our statute is modeled on permanency planning as a matter of federal law, it is useful to review the history of federal permanency plans for children who have been removed from their parents. Federal permanency planning arose first under federal statutes concerning neglected children. Congress sought a remedy for children who, after removal from their parents, were languishing in foster care rather than being placed permanently in adoptive homes.[4] See the Adoption Assistance and Child Welfare Act of 1980, Pub. L. No. 96-272, §§ 1-310, 94 Stat. 500 (codified at 42 U.S.C. §§ 620-628, 670-679a [1988 Ed.]) and the Adoption and

---

[3] A few cases have described the permanency planning process for *neglected* children in the context of a proceeding for the termination of parental rights. See, e.g., *In re Candace H.*, 259 Conn. 523, 524–25, 790 A.2d 1164 (2002); *In re Victoria B.*, 79 Conn. App. 245, 248 n.4, 829 A.2d 855 (2003).

[4] See L. Adler, "The Meanings of Permanence: A Critical Analysis of the Adoption and Safe Families Act of 1997," 38 Harv. J. on Legis. 1, 2 (2001).

Safe Families Act of 1997, Pub. L. No. 105-89, §§ 101-501, 111 Stat. 2115 (codified as amended in various sections of 42 U.S.C. [2000 Ed.]).[5] As a condition for state access to federal funding, these statutes required the states to engage in permanency planning for children in temporary state custody. 42 U.S.C. § 670 (2000 Ed.); *Suter* v. *Artist M.*, 503 U.S. 347, 350–51, 112 S. Ct. 1360, 118 L. Ed. 2d 1 (1992).

Current federal law for permanency planning requires states to institute plans demonstrating "reasonable efforts" to reunify abused and neglected children with their parents after the children's placement in foster care. See 42 U.S.C. § 671 (a) (15) (2000 Ed.). Within twelve months of foster home placements, state courts must hold permanency hearings to consider the future status of each child. 42 U.S.C. § 675 (5) (C) (2000 Ed.). Congress also requires states to make specific choices about the appropriate permanent placement of children in their care by specifying whether the child will be returned to a parent, placed for adoption, placed with a relative, referred to legal guardianship or, if a compelling reason is shown, placed in another planned permanent living arrangement. 42 U.S.C. § 675 (5) (C) (2000 Ed.); 45 C.F.R. § 1356.21 (b) (2) (i).

In response to these federal initiatives, our legislature passed several pieces of legislation to keep the state in compliance with federal law and thereby to continue

---

[5] Our Supreme Court also expressed an early concern for the placement of foster care children. "The well-known deleterious effects of prolonged temporary placement on the child . . . makes continuing review by [the commissioner] of all temporary custody and commitment cases imperative. Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings." *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 292, 455 A.2d 1313 (1983).

to receive federal funds.[6] Specifically, the legislature has implemented a permanency planning process for all children in its custody, including those who are admitted voluntarily; General Statutes § 17a-11 (d); adjudicated as neglected or dependent; General Statutes § 46b-129 (k); or convicted as delinquent. General Statutes § 46b-141 (d).

Notably, the last of these enactments, § 46b-141, the statute presently at issue, has no direct relationship to congressional concerns about delay in the permanent placement of neglected children. Nonetheless, the statute borrows from federal law in requiring reasonably prompt permanency planning.

No Connecticut appellate court has had the opportunity to consider and to interpret permanency plans as applied to delinquents. The novelty of our inquiry is underscored by the apparent absence of analogous cases in other jurisdictions.[7] We now turn to the precise claims raised by the juvenile.

### III

### CHALLENGE TO AN ONGOING COMMITMENT AT A PERMANENCY HEARING

The juvenile renews in this court his claim that there is a mandatory linkage between a permanency plan

[6] See, e.g., 44 H.R. Proc., Pt. 15, 2001 Sess., p. 5048, remarks by Representative Gail K. Hamm ("[t]he amendment [to our child protection laws] makes numerous changes to conform our state law to the federal Adoption and Safe Families Act of . . . 1997"); 44 H.R. Proc., Pt. 23, 2001 Spec. Sess., p. 7940, remarks by Representative John W. Thompson ("[The amendments to § 46b-141] conform state law to federal regulations to the Adoption and Safe Families Act of 1997. If we didn't do this, we would suffer a financial penalty.").

[7] The sparseness of out-of-state case law may be explained by the fact that while all fifty states have adopted permanency plan procedures for abused and neglected children, only five other states have adopted similar procedures for delinquent children. These five states are California, Kansas, Kentucky, New York and Wisconsin. See Cal. Welfare & Institutions Code § 727.3 (Deering Sup. 2002); Kan. Stat. Ann. § 38-1664 (2001); Ky. Rev. Stat. Ann § 610.125 (Lexis Nexis Sup. 2003); N.Y. Fam. Ct. Act § 355.5 (McKinney Sup. 2004); Wis. Stat. Ann. § 938.38 (West Sup. 2003).

hearing required by § 46b-141 (d) and a hearing on the continuation of his commitment to the custody of the commissioner. The trial court held that § 46b-141 (d) does not require the commissioner, at a permanency hearing, to establish the basis for the delinquent's continued commitment until the expiration of his term of commitment. We agree with the trial court.

From the outset of the permanency plan proceedings, the juvenile consistently has argued that the commissioner had an obligation to show a compelling reason for the continuation of his commitment. Concededly, he did not himself file a motion, pursuant to § 46b-141 (e),[8] for termination of his commitment before the permanency plan hearing.[9] He bases his claim on the fact that the goal the court approved, pursuant to § 46b-141 (d) (1), included the phrase "revocation of commitment." In response, the commissioner argues that the type of "revocation" contemplated at a permanency plan hearing is a goal of future rather than immediate revocation of commitment. We agree with the commissioner.

We must decide the scope of a § 46b-141 (d) hearing in accordance with established principles of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legis-

[8] General Statutes § 46b-141 (e) provides in relevant part: "Commitments may be reopened and terminated at any time by said court . . . . The parents or guardian of such child may apply not more than twice in any calendar year for such reopening and termination of commitment . . . ."

[9] The trial court noted in its memorandum of decision that the juvenile's counsel intended to file a motion for termination but never explicitly did so. The reason for the juvenile's decision not to file a motion pursuant to General Statutes § 46b-141 (e) may have been that our case law holds that "the burden is upon the person applying for the revocation of commitment to allege and prove that cause for commitment no longer exists." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 659, 420 A.2d 875 (1979). The juvenile intentionally sought to raise the issue of the continuation of commitment at the permanency plan hearing in order to shift the burden of proof to the commissioner.

lature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003).[10] Accordingly, we begin with the relevant text of § 46b-141 (d), which provides in part that a "permanency *plan* may include the *goal* of: (1) Revocation of commitment and placement of the child with the parent or guardian . . . ." (Emphasis added.)

On its face, § 46b-141 (d) does not explicitly impose on the commissioner, at a permanency hearing, a duty to establish that a delinquency commitment should continue. Indeed, the only explicit mention of "revocation" in § 46b-141 (d) (1) refers to "[r]evocation of commitment" as a "plan" and "goal." The legislature's choice of language is entirely consistent with the fact that permanency planning historically has been directed to a determination of the *future status* of children.[11] It was therefore entirely reasonable for the legislature, in enacting § 46b-141 (d), to focus on the proper placement of a juvenile when his period of commitment expires.

Furthermore, the significance of the absence of a requirement to prove the necessity for a continued com-

---

[10] Because the relevant statutory text and the relationship of that text to other statutes is not plain and unambiguous, we need not consider the effect of Public Acts 2003, No. 03-154, § 1. *Jones* v. *Kramer*, 267 Conn. 336, 344 n.4, 838 A.2d 170 (2004).

[11] See, e.g., 42 U.S.C. § 675 (5) (C) (1988 Ed.) ("hearing shall determine the future status of child").

mitment in § 46b-141 (d) is underscored by examination of the text of another statute governing permanency planning. For children who have been adjudicated as abused or neglected, our legislature expressly has required the commissioner to justify continued commitment as part of the permanency planning process. See General Statutes § 46b-129 (k).[12] This statutory contrast demonstrates that, if the legislature desired to include a requirement that the commissioner justify the continuation of a delinquency commitment at a permanency hearing,[13] it easily could have done so. As our case law has often observed, "[w]e generally presume that when the legislature repeatedly uses certain terminology and chooses not to use that terminology in a particular provision, it has intended a different meaning." *Interlude, Inc.* v. *Skurat*, 266 Conn. 130, 143, 831 A.2d 235 (2003).

The arguments that the juvenile offers in rebuttal of this textual analysis are unpersuasive. First, he maintains that we should read the statutory procedures that have been established in the abused-neglect context into delinquency proceedings. Second, he posits that the trial court had inherent power to terminate a com-

---

[12] General Statutes § 46b-129 (k) (1) provides in relevant part that "[n]ine months after placement . . . the commissioner shall file a motion for review of a permanency plan and *to maintain or revoke the commitment.* . . . A permanency hearing on any motion for review of the permanency plan *to maintain or revoke commitment* shall be held within ninety days of the filing of such motion. . . . *The burden of proof shall be upon the commissioner to establish that the commitment should be maintained.* . . ." (Emphasis added.)

[13] The legislature's choice to require the commissioner to show why a commitment should be continued in the abused-neglect context and not in the delinquency context may be explained by the relevant term limits. In 2001, the legislature amended General Statutes § 46b-129 (j), by changing the commitment period for neglected children from eighteen months to an indefinite period subject to court ordered revocation. Therefore, it seems logical that the legislature could have viewed a permanency plan hearing for a neglected child as an opportune time for the court to evaluate the commitment as well.

mitment at a permanency plan hearing. In the absence of any authority for either proposition, we decline to consider them further.

We conclude, therefore, that the trial court properly construed § 46b-141 (d). Permanency planning for a juvenile delinquent does not require the commissioner to justify the continuation of a previously imposed delinquency commitment.

## IV

### DISCREPANT CHARACTERIZATIONS OF PERMANENCY PLAN GOAL

Even if every placement plan does not require proof of the need for continued commitment, the juvenile argues that his case is different because of a discrepancy between the wording of the commissioner's proposed permanency plan and the court's permanency plan order. According to the juvenile, as a result of this discrepancy, the validity of the permanency plan order must be tested in accordance with the stricter mandate of subdivision (5) of § 46b-141 (d) rather than the broader mandate of subdivision (1) to which the court's order conformed. Subdivision (5) requires the commissioner to document a "compelling reason" for adoption of a permanency plan other than that specified in subdivisions (1) through (4). To prove a "compelling reason," according to the juvenile, the commissioner was required to make an evidentiary showing of a need for his continued commitment. We disagree with the juvenile's construction of § 46b-141 (d).[14]

The verbal discrepancy that is the focus of the juvenile's claim is undeniable. In the commissioner's plan, submitted on a standard commission form, she recommended that, in the best interest of the juvenile, the

---

[14] We need not, therefore, decide what proof is required to show a "compelling need."

goal for a permanency plan should be "[r]eunification of the [juvenile] with the parent . . . ." The trial court, however, signed a standard judicial form that identified the goal that the court had approved as "[r]evocation of [c]ommitment and placement of the [juvenile] with the [mother]." See General Statutes § 46b-141 (d) (1).

Asked to clarify its ruling with respect to this issue, the court reaffirmed that the "[commissioner's] permanency plan goal of reunification with mother is in the child's best interest." As a result, the court held, "in accordance with the language of [§ 46b-141 (d)] and form JD-JM-145 (Delinquency Permanency Plan Order), this court approved as a goal by [the commissioner] for the child revocation of the commitment and placement of the child with the mother."

According to the juvenile, the commissioner's omission of the words, "revocation of commitment," in her permanency plan proposal barred the court from treating the plan as conforming with the placement goal of reunification and revocation of commitment set out in § 46b-141 (d) (1). Rather, the juvenile contends that the court should have treated the commissioner's proposed plan as having recommended placement of the child in a "planned permanent living arrangement," other than those explicitly mentioned in subdivisions (1) through (4) of § 46b-141 (d). See General Statutes § 46b-141 (d) (5). In his view, to justify a subdivision (5) placement plan, the court should have required the commissioner to show a compelling need for his continued commitment to the commissioner.

Applying the rules of statutory construction described previously, we must examine the text of § 46b-141 (d) to see whether it supports the juvenile's position. For these purposes, it is as important to note what the statute does *not* say as what it *does* say. We are not persuaded that the rules stated in the text turn

upon the verbal niceties that the juvenile has called to our attention.

As an initial matter, the juvenile assumes that the statute's articulation of the goal of "revocation," as specified in § 46b-141 (d) (1), prescribes rules for the timing of the juvenile's release from the commissioner's custody. The text does not say so. Reading it literally, we have no reason to fault the order of the trial court. The court's inclusion of the words, "revocation of commitment," had no material impact on the juvenile's planned placement with his mother in the future.

For similar reasons, we can find no legal significance in the commissioner's recommendation that the juvenile be reunified with his mother without an express reference to termination of his commitment. Indeed, one could envisage a plan for reunification that would involve supervised home visits during the remainder of the period of commitment. During this period, the commissioner would have had the right to revoke the commitment early; General Statutes § 17a-10 (d); or to let it expire by operation of law. General Statutes § 46b-141 (a). Nothing in § 46b-141 (d) limits the commissioner's exercise of these options.

Furthermore, a logical extension of the juvenile's argument would be the creation of a new permanency goal of "reunification, without revocation" as an example of the "other planned permanent living arrangement" goal articulated in § 46b-141 (d) (5). Although § 46b-141 (d) (5) does not define "other planned permanent living arrangement" comprehensively, it includes, as one example, the placement of a juvenile "in an independent living program . . . ." That example strongly suggests that the legislature did not intend to encompass a parental placement within subdivision (5), or to impose upon the commissioner the higher burden of proof that distinguishes a permanency plan under

subdivision (1) from a permanency plan under subdivision (5). "[W]e read each statute in a manner that will not thwart its intended purpose or lead to absurd results." (Internal quotation marks omitted.) *Cardenas* v. *Mixcus*, 264 Conn. 314, 322–23, 823 A.2d 321 (2003).

In light of these considerations, we conclude that the trial court properly approved the commissioner's permanency plan goal of revocation and reunification as articulated in § 46b-141 (d) (1). The fact that the commissioner stated her goal somewhat summarily does not alter our conclusion.

## V

## DUE PROCESS CHALLENGE

The juvenile's final claim is that the trial court violated both his federal and state constitutional rights[15] by denying him a full evidentiary hearing on the continued validity of his commitment to the commissioner. The commissioner maintains that a permanency plan hearing under § 46b-141 (d) merely allows a juvenile to contest the commissioner's future plans for him by challenging the details of a submitted plan of reunification but does not afford him the right to argue the merits of an existing commitment. We agree with the commissioner.

At the outset, we note those issues on which the commissioner and the juvenile agree. It is common ground that a committed delinquent is entitled to participate in a "permanency hearing," at which "the court shall review and approve a permanency plan that is in the best interest of the child . . . ." General Statutes § 46b-141 (d). Where the parties diverge is on the appropriate *subject matter* of that hearing.

---

[15] The juvenile has not offered any analysis of his claims under our state constitution. We decline, therefore, to discuss the merits of his state constitutional law representations.

The trial court denied the juvenile's request for a full evidentiary hearing with respect to his continued commitment on the ground that § 46b-141 (d) does not contemplate consideration of this issue. As previously noted, we agree with the court's interpretation of this statute. No one is entitled to an evidentiary hearing on an issue that is not relevant to the proceedings. See *Kucej* v. *Statewide Grievance Committee*, 239 Conn. 449, 462, 686 A.2d 110 (1996) ("determination of the particular process that is due depends on the nature of the proceeding and the interests at stake"), cert. denied, 520 U.S. 1276, 117 S. Ct. 2457, 138 L. Ed. 2d 214 (1997).

Moreover, the juvenile had a right to contest the merits of his commitment at the time of his initial commitment. At that juncture, he and his parents had due process rights to counsel, cross-examination, confrontation and notice of charges, and to present their own testimony. See General Statutes §§ 46b-128, 46b-135, 46b-136, 46b-138a. The juvenile has not cited any authority, either within the text or legislative history of § 46b-141, to support his contention that he is entitled to a subsequent commitment hearing at which the commissioner would again have to justify the propriety of his commitment.[16] Indeed, when the legislature intended to require such an evidentiary hearing, it has done so expressly. See General Statutes § 46b-129 (k) (1) (*"court shall hold evidentiary hearings* in connection with any contested motion for review of the permanency plan *and to maintain or revoke commitment"* [emphasis added]).

Rather, as we have already held, a permanency hearing pursuant to § 46b-141 (d) has only one purpose. That purpose is to provide a prompt judicial hearing to

[16] The court's decision did not deny the juvenile or his parents or guardians the opportunity to file an independent motion for termination of the commitment at any time. General Statutes § 46b-141 (e).

review the permanency goal specified in a permanency plan submitted by the commissioner. In this case, that goal was reunification with the juvenile's parent. The juvenile never contested that aspect of the permanency plan.[17]

In conclusion, we hold that the trial court properly construed the terms of § 46b-141 (d) and, therefore, did not violate the juvenile's statutory or constitutional rights. The court properly declined to comply with the juvenile's request to use a permanency plan hearing as an opportunity for review of the juvenile's continued commitment to the commissioner.[18]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[17] In his reply brief, for the first time on appeal, the juvenile challenged the commissioner's representation that he had agreed to the substantive terms of the permanency plan. We decline to review the merits of this contention.

First, as a procedural matter, we have repeatedly held that a reply brief is not the proper vehicle for curing an omission in the appellant's brief. See, e.g., *State* v. *Wilson*, 242 Conn. 605, 607 n.5, 700 A.2d 633 (1997); *Place* v. *Waterbury*, 66 Conn. App. 219, 221 n.4, 783 A.2d 1260 (2001). The reason for this policy is clear. An appellant's claim must be raised in its original brief, so that the claim can be "fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument." (Internal quotation marks omitted.) *Calcano* v. *Calcano*, 257 Conn. 230, 244, 777 A.2d 633 (2001).

Second, in addition to the importance of providing notice and an opportunity to reply to the opposing party, another policy reason for limiting the review of claims initially raised in a reply brief is that it encourages consistency. There was evidently confusion at trial arising out of disagreement about the nature of the juvenile's equivocal objection to the permanency plan. Analytically, the question was whether acquiescence in the proposed plan meant acquiescence only in the goal of reunification with the mother or whether it also meant acquiescence in the timing of this reunification. This verbal sparring should not obscure the undeniable fact that the juvenile wanted immediate reunification while the commissioner wanted to postpone the reunification until the expiration of the juvenile's term of commitment. The juvenile apparently was concerned about the place of his commitment for the remainder of his term.

[18] We leave to another day the type of hearing afforded to a juvenile who properly objects to the terms of a permanency plan.