OPINION OF THE COURT
John M. Hunt, J.
I
The Commissioner of the New York State Office of Children and Family Services (OCFS) has filed a permanency hearing petition pursuant to Family Court Act § 355.5 seeking a determination that the agency has exercised reasonable efforts to make it possible for the respondent to return to her home and for an order approving its proposed permanency plan for the respondent.
By petition filed pursuant to Family Court Act § 310.1 (1) on December 21, 2006, the presentment agency (Corporation Counsel of the City of New York), alleged that the respondent, Robin G. (born in 1991), had committed acts which, were she an adult, would have constituted the crime of criminal trespass in the third degree. On February 8, 2007, the presentment agency filed what was essentially a “superseding” petition (see Matter of Detrece H., 78 NY2d 107, 111 [1991]), which alleged that respondent had committed acts which, were she an adult, would have constituted the crimes of robbery in the second degree, grand larceny in the fourth degree, attempted grand larceny in the fourth degree, petit larceny, attempted petit larceny, criminal possession of stolen property in the fifth degree and criminal trespass in the third degree. On March 14, 2007 respondent entered an admission that she committed an act which would have constituted the crime of criminal trespass in the third degree, a class B misdemeanor under Penal Law § 140.10 (a). The dispositional hearing was conducted on March 30, 2007 and May 24, 2007. By order dated May 24, 2007 respondent was adjudicated to be a juvenile delinquent (Family Ct Act § 352.1 *330 [1]), and she was placed with OCFS for a period of 12 months with a direction that OCFS place her in the custody of GrahamWindham, an authorized agency within the meaning of Social Services Law § 371 (10) (Family Ct Act § 352.2 [1] [c]; § 353.3 [1], [2]).
On February 15, 2008, OCFS filed this permanency petition pursuant to Family Court Act § 355.5.[1] The OCFS petition alleges, insofar as relevant, that respondent was born in 1991, that the child has been placed with OCFS since May 24, 2007, that she has been under the care of Graham-Windham since June 7, 2007, that her placement expires on May 11, 2008 and that in accordance with Family Court Act § 355.5, a permanency hearing must be conducted and completed on or before March 7, 2008. OCFS further alleges that the permanency plan is to return the respondent to the community and the custody of her mother in March of 2008. OCFS states that its permanency plan for the respondent should be approved because the child’s “mother would like for respondent to return to her residence upon successful completion of [her] treatment program at the Graham School [and] [i]t would be in the child’s best interest to return to [her] mother’s home.” The petition further notes that respondent is enrolled in special education at the Graham School and that she is receiving weekly counseling and is also enrolled in an independent living skills course to assist her transition back into the community.[2]
A “Court Summary” report dated January 18, 2008 by Ad-jar atou Zongo, the responsible case manager at GrahamWindham, is appended to the permanency planning petition. That report states, inter alia, that respondent “is struggling in *331 school, but is putting forth efforts to passing her classes. She attends her tutoring sessions on a regular basis. The cottage manager [at Graham-Windham] believes that Robin may have some learning disabilities and has informed the Graham School.” The report further states that Robin has made improvements in her behavior and that she had been generally cooperative and had abided by rules while home on weekend visits, until her home visit during the holidays in December 2007 when she did not obey her curfew or follow the directions of her mother. As a result of Robin’s misbehavior, weekend visitation was suspended for a period of time, although Robin’s mother was still in agreement that her daughter should return home in March of 2008. Finally, because OCFS had no plans to request an extension of Robin’s placement, the report states that “[i]f placement is not extended for aftercare preventative services, Graham-Windham will assist [the mother] in enrolling Robin into a community school where she currently resides. School enrollment begins August 27, 2008” (emphasis added).
An updated “Court Summary” dated February 21, 2008 by Ms. Zongo of Graham-Windham was submitted to the court on February 29, 2008. That summary states, insofar as relevant, that Robin’s placement is scheduled to expire on March 11, 2008, that while Robin has adjusted to the program at the agency, it was again observed that Robin “is struggling with school” where she is enrolled in a 9th grade special education class, and that the child “lacks the fundamentals to complete her school work and often becomes frustrated.” The summary further states that “Robin was punished by not being [permitted] to go home for two weekends. Robin is aware that her behavior that she portrays at home when she visits on the weekend needs to be corrected and she is learning how to cope with her mother’s rules.” With respect to the respondent’s behavior at the facility, the agency reports that she “got into a physical altercation with another female resident in school” on “January 31st, 2008.” The summary concludes that the agency believes that “[t]here is no reason that Robin[’s] time [placement] should be extended at this point.”
When the parties appeared before the court on February 29, 2008 the court reviewed the permanency planning petition and the Graham-Windham reports dated January 18 and February 21, 2008. At that time, the court directed that Graham-Windham submit updated reports and that OCFS and Graham-Windham submit an explanation of the proposed permanency plan of *332 “return to parent” along with an explanation as to why no petition to extend Robin’s placement was being filed. An updated report dated March 5, 2008 was submitted when the case next came before the court on March 7, 2008. The report sets forth the same background information concerning Robin’s placement, but the report also indicates that
“[s]ince Robin found out about her discharge date, she has been out of program and not attending school on a regular basis. The cottage manager said that Robin started having a relationship with a female peer on campus. Robin’s behavior has changed for the worse. One of the reasons that Robin would like to remain on [the] GrahamWindham campus is so that she can continue her relationship with her girlfriend.”
The court thereafter continued the hearing and directed that counsel for the Commissioner of the Office of Children and Family Services appear.
The hearing resumed on March 10, 2008. Counsel for all parties appeared and Robin was represented by her Law Guardian. The Law Guardian advised the court that Robin’s mother was not willing to have her return home at this time. Based upon that information, the case was continued so that OCFS could report on whether the mother was still a discharge resource for its plan to return Robin home without any extension of placement or aftercare supervision by OCFS. Finally, because the next scheduled court date was beyond the date upon which Robin’s current placement was to expire, the court temporarily extended placement with OCFS until April 2, 2008.
On March 24, 2008, the Commissioner of OCFS filed an order to show cause seeking an extension of Robin’s placement pursuant to Family Court Act § 355.3. The case came before the court on April 2, 2008 on both the permanency planning petition and the extension of placement petition. The court received three further written reports: a court summary update from GrahamWindham dated March 25, 2008; a court summary report from OCFS which is dated March 28, 2008; and a March 25, 2008 clinical report from Constance Douglas, a social worker at Graham-Windham who is treating Robin. The March 25, 2008 report by Ms. Zongo of Graham-Windham states, in pertinent part, that
“Robin[’s] behavior has gotten worse within the last couple of months. She is struggling in school *333 and is constantly out of program during school hours. Robin no longer attends her tutoring sessions . . . because she is out of program during her tutoring sessions . . . [She] does not follow the rules and regulation^] of the cottage or campus . . . [W]hen Robin is told to complete a task within the cottage she does not comply. Robin is not taking her placement. . . seriously and is not utilizing the services that are being given to her. Robin is struggling with some issues with her biological mother . . . [T]he reason why Robin[’s] behavior has gotten worse is because she is hanging out with a negative peer on campus. Robin wants to remain on [the] Graham-Windham campus because she has a girlfriend at the RTC . . . Since the last court date of March 10, 2008, Robin[’s] behavior has not improved. She continues to go out of program and is non-compliant to the rules and regulations. Robin is constantly redirected by the staff but is still non-compliant.”
With respect to Robin’s overall functioning at GrahamWindham, her case manager Ms. Zongo reported that although the child has been provided with appropriate services, she “is non-compliant with the program [and] finds everything funny. When staff confronts her about her behavior she does not take any accountability for her behavior.” As for Robin’s education, the agency notes that “Robin is currently failing all of her classes and does not attend her tutoring class.” Ms. Zongo’s report further states that Robin’s mother would not be present in court on April 2, 2008 because she would be in Guyana on an extended visit, although the mother had recently informed Ms. Zongo that she didn’t actually mean to imply that she was unwilling to have Robin come home, and that “she is still willing to care for Robin and would like Robin to return back to her home when she is discharged from Graham-Windham RTC, providing that she get[s] assistance from OCFS” (emphasis added).
The clinical report by Constance Douglas, LCSW, indicates that she has been providing psychotherapy for Robin “since her arrival to Graham on June 13, 2007.” According to Ms. Douglas, Robin has an “ongoing strained and dysfunctional relationship with her mother. She has said on several occasions that she does not believe that her mother loves her, that they fight terribly when Robin goes home, and that her mother does not *334 really want her.” Ms. Douglas observed that Robin’s perception of her mother’s feelings “seems to evidently be somewhat true, if Robin’s date for discharge is April 2, 2008 and her mother is planning a month long trip abroad without her daughter, either prior to discharge or immediately following.” Based upon her treatment of Robin and the state of the relationship between the mother and child, the social worker recommends “that Robin stay at Graham AT LEAST until her mother’s return from abroad or until the end of the school year.” Ms. Douglas also indicated that it was imperative that Robin’s mother participate in family therapy “to help facilitate a better transition home for both mother and daughter” and she indicated that Robin’s mother “NEEDS to take an active role in her daughter’s growth, healing and development.”
A report by Jennifer Utley, a youth counselor at the Office of Children and Family Services states that at the court hearing conducted on March 10, 2008, Robin’s Law Guardian reported that the mother had contacted him and told him that “she is not Robin’s mother and cannot accept Robin home at the end of her OCFS placement” and that the court directed that OCFS complete a home assessment and explore alternative resources. Ms. Utley subsequently met with the mother, Rosarita G., at her home on March 17, 2008. Apparently, Ms. G. told Ms. Utley that while she is Robin’s biological mother, she gave the child up for adoption in Guyana as an infant, but that the child came to live with her in the United States when the child was seven years old and she is now “illegally” in the United States. Ms. Utley further reported that Rosarita G. indicated that “there are allegations of sexual abuse towards Robin by” sons of the adoptive parents who live in Guyana, and that the adoptive father “has denied this and actually blamed her husband for the sexual abuse.” Ms. G. also informed Ms. Utley that she is willing to have Robin return to her home, but that the child requires ongoing services and supervision.
The mother also informed Ms. Utley that Robin misbehaves while home on weekend visits and that she does not obey her commands or her curfew and she sometimes stays out all night. In addition, it was discovered that Robin may be involved with a gang. After Ms. Utley completed the home visit with Ms. G. she reported back to her supervisor, and the supervisor called in a report of suspected child abuse or maltreatment to the State Central Register (see Social Services Law §§ 413, 415). The report to the State Central Register was based upon the failure *335 of the mother to provide Robin with proper guardianship “based on her initial statements regarding refusal to accept Robin home upon discharge, as well as for leaving the country while Robin’s court matters remain unresolved.” Ms. Utley indicated that while she found the mother to be an appropriate discharge resource, the mother indicated that “she would like for Robin’s placement to be extended so that Robin could complete the school year in Graham-Windham and then transfer to aftercare supervision with OCFS.” Thus, Ms. Utley concluded that Robin’s placement with OCFS should be extended for a period of nine months to allow her to complete the current school year and to permit her to return home with OCFS aftercare supervision which can include “multi-systemic therapy services” which is designed to provide “a combination of home-based family therapy and case management services to address delinquent behavior and facilitate the child’s transition to the community.”
With respect to the late filed petition to extend Robin’s placement with OCFS, the agency submitted an affidavit from Roosevelt Bullock, a youth counselor with the agency, setting forth the reason why the petition was not filed at least 60 days prior to the expiration of the period of placement ordered by the court. According to Mr. Bullock:
“The petition to extend placement of this respondent is being submitted less than sixty days prior to the expiration of the current placement for the following reasons: OCFS original plan was to discharge youth to parent. The respondent was slated to be discharged from the Graham Windham School and Residential Treatment Center on her expiration date of March 11, 2008. However, due to a change of circumstances, and a recent court recommendation that the respondent receive aftercare services, we are requesting that her placement with OCFS [be] extended an additional six months. The change in circumstances developed at the last hour during the March 11, 2008 permanency hearing when the respondent’s mother informed the law guardian by telephone that she would not accept the respondent back into the home.
“Based on the respondent’s history of school truancy she can certainly benefit from the aftercare supervision/case management services that OCFS provides. The respective OCFS aftercare program will be notified prior to the respondent’s *336 expiration/discharge date so that the school enrollment process can be initiated.”
The permanency hearing was concluded on April 2, 2008 and the parties rested upon the reports and other documentary evidence. The court thereafter reserved decision on the issue of good cause for the late filing of the petition to extend placement, the underlying petition to extend placement, as well as the permanency planning petition. The proceedings then continued on April 11, 2008 and on that date the court was informed by social worker Constance Douglas of GrahamWindham that since April 2, 2008,
“Robin has become increasingly more depressed and withdrawn. She comes off as depressed, hopeless and anxious. She is overwhelmed by her discharge status, but more specifically by her mother’s non-activity in her life . . . She reports feeling abandoned, like she has no home and no one to care [for] or love her.”
In addition, Ms. Douglas reported that because the child “is heading in a downward spiral” and “she needs more support than can be given to her at Graham . . . [she] is being hospitalized at Stony Lodge Hospital where she will receive the counseling and round the clock support care she needs at this time to deal with her issues of loss and depression.”
Based upon the evidence adduced during the proceedings, the court found that OCFS had established good cause for the late filing of the petition to extend Robin’s placement. More specifically, the court determined that the recent precipitous decline in Robin’s behavior, the onset of psychological issues in the 60 days prior to March 11, 2008, which ultimately resulted in the child’s current hospitalization in a psychiatric facility, along with the mother’s present unavailability to resume custody of Robin and her apparent ambivalence to having the child return home, constituted “good cause” for the untimely filing of the petition to extend placement (Family Ct Act § 355.3 [1]; Matter of Loren S., 220 AD2d 857, 858 [1995]; Matter of Donald MM., 241 AD2d 634, 635 [1997]; see Matter of Andre T., 37 AD3d 233, 235 [2007]). Moreover, based upon the evidence adduced in the proceedings conducted before the court, including respondent’s current psychiatric hospitalization and the mother’s present extended absence from New York, the parties have stipulated that it is in respondent’s best interests to have her placement *337 with OCFS extended for a period of 90 days, effective April 11, 2008 and without prejudice to the filing of a subsequent petition to extend placement by OCFS.
Accordingly, the order to show cause is granted upon a finding of good cause and the petition by OCFS for extension of respondent’s placement is granted pursuant to the terms of the parties’ stipulation (Family Ct Act § 355.3 [4]). However, the court reaches a different conclusion with respect to the permanency hearing petition filed by OCFS.
II
The permanency hearing provisions of the juvenile delinquency statute, which are codified in Family Court Act § 355.5, were added by the Legislature in 1999 (L 1999, ch 7) when it enacted New York’s version of the Adoption and Safe Families Act (hereinafter ASFA). The new statute “brought New York into conformity with a 1997 federal law of the same name, maintaining the State’s eligibility for federal funding for foster care services” (Matter of Marino S., 100 NY2d 361, 369 [2003], cert denied 540 US 1059 [2003]). One of ASFA’s primary goals is ensuring “prompt permanency in a child’s life” (id.), although fiscal considerations clearly influenced the State’s decision to adopt the federal statute.
With respect to children who have been adjudicated to be juvenile delinquents and who have been placed away from their home with OCFS, a local commissioner of social services, or an authorized agency, the pertinent ASFA provisions of Family Court Act article 3 read as follows in their present form:
“§ 355.5. Permanency hearing “1. For the purposes of this section the term ‘non-secure facility’ means a facility operated by an authorized agency in accordance with an operating certificate issued pursuant to the social services law or a facility, not including a secure or limited secure facility, with a capacity of twenty-five beds or less operated by the office of children and family services in accordance with section five hundred four of the executive law.
“2. Where a respondent is placed with a commissioner of social services or the office of children and family services pursuant to section 353.3 of this article for a period of twelve or fewer months and resides in a foster home or a non-secure facility;
*338 “(a) The initial permanency hearing shall be held no later than twelve months after the respondent who was placed with a commissioner of social services or the office of children and family services entered foster care and such permanency hearing shall be held in conjunction with an extension of placement hearing held pursuant to section 355.3 of this article.
“(b) Subsequent permanency hearings shall be held no later than every twelve months following the respondent’s initial permanency hearing and shall be held in conjunction with an extension of placement hearing held pursuant to section 355.3 of this article.
“3. Where a respondent is placed with a commissioner of social services or the office of children and family services pursuant to section 353.3 of this article for a period in excess of twelve months and resides in a foster home or in a non-secure facility; “(a) the initial permanency hearing shall be held no later than twelve months after the respondent who was placed with a commissioner of social services or the office of children and family services entered foster care.
“(b) subsequent permanency hearings shall be held no later than every twelve months following the respondent’s initial twelve months in placement; provided, however, that they shall be held in conjunction with an extension of placement hearing held pursuant to section 355.3 of this article.
“4. For the purposes of this section, the respondent shall be considered to have entered foster care sixty days after the respondent was removed from his or her home pursuant to this article.
“5. A petition for an initial or subsequent permanency hearing shall be filed by the office of children and family services or by the commissioner of social services with whom the respondent was placed. Such petition shall be filed no later than sixty days prior to the end of the month in which an initial or subsequent permanency hearing must be held, as directed in subdivision two of this section . . .
“7. At the permanency hearing, the court must consider and determine in its order:
“(a) where appropriate, that reasonable efforts were *339 made to make it possible for the respondent to return safely to his or her home, or if the permanency plan for the respondent is adoption, guardianship or another permanent living arrangement other than reunification with the parent or parents of the respondent, that reasonable efforts were made to make and finalize such alternative permanent placement including consideration of appropriate in-state and out-of-state placements;
“(b) in the case of a respondent who has attained the age of sixteen, the services needed, if any, to assist the respondent to make the transition from foster care to independent living;
“(c) in the case of a respondent placed outside of this state, whether the out-of-state placement continues to be appropriate and in the best interests of the respondent;
“(d) with regard to the completion of placement ordered by the court pursuant to section 353.3 or 355.3 of this article: whether and when the respondent: (i) will be returned to the parent; (ii) should be placed for adoption with the local commissioner of social services filing a petition for termination of parental rights; (iii) should be referred for legal guardianship; (iv) should be placed permanently with a fit and willing relative; or (v) should be placed in another planned permanent living arrangement if the office of children and family services or the local commissioner of social services has documented to the court a compelling reason for determining that it would not be in the best interest of the respondent to return home, be referred for termination of parental rights and placed for adoption, placed with a fit and willing relative, or placed with a legal guardian; and
“(e) with regard to the completion or extension of placement ordered by the court pursuant to section 353.3 or 355.3 of this article, the steps that must be taken by the agency with which the respondent is placed to implement the plan for release or conditional release submitted pursuant to paragraph (c) of subdivision seven of section 353.3 of this article, including consideration of appropriate in-state and out-of-state placements, the adequacy of such plan and any modifications that should be made to such *340 plan.
“8. At the permanency hearing, the court shall consult with the respondent in an age-appropriate manner regarding the permanency plan for the respondent.
“9. The court shall not reduce or terminate the placement of the respondent prior to the completion of the period of placement ordered by the court pursuant to section 353.3 or 355.3 of this article.”
A
The adoption of ASEA by the State Legislature in 1999 served two important and related policies: the achievement of permanency for children placed in foster care at the earliest possible time, and the maintenance of the State’s eligibility for federal funding of its foster care system (Matter of Marino S. at 369; Matter of Jeffrey M., 6 AD3d 1156 [2004]; see also New Jersey Div. of Youth & Family Servs. v A.R.G., 179 NJ 264, 283, 845 A2d 106, 117-118 [2004]; In re H.G., 197 Ill 2d 317, 319-320, 757 NE2d 864, 865-866 [2001]; In re Adoption of A.M.B., 812 A2d 659, 668, 2002 PA Super 321, ¶ 20 [2002]).
In the case of an adjudicated juvenile delinquent, the term “permanency hearing” is defined as “an initial or subsequent hearing held in accordance with the provisions of this article for the purpose of reviewing the foster care status of the respondent and the appropriateness of the permanency plan developed by the commissioner of social services or the office of children and family services” (Family Ct Act § 301.2 [16]; e.g. Matter of Martin E., 23 AD3d 959 [2005]).
Family Court Act § 352.2 authorizes several placement alternatives for a child who is adjudicated to be a juvenile delinquent. Those placements are as follows: placement in the respondent’s own home or in the custody of a suitable relative or other suitable private person (Family Ct Act § 352.2 [1] [c]; § 353.3 [1]); placement with a county commissioner of social services which may include a direction that such commissioner place the respondent “with an authorized agency or class of authorized agencies” (Family Ct Act § 352.2 [1] [c]; § 353.3 [2]); and placement with the Office of Children and Family Services pursuant to article 19-G of the Executive Law (Family Ct Act § 352.2 [1] [c]; § 353.3 [1]), which may include a direction that OCFS in turn place the respondent with an authorized agency or class of authorized agencies (Family Ct Act § 353.3 [4]). In *341 addition, the court may direct that OCFS place the respondent in a secure facility for the first 60 days of a placement (Family Ct Act § 353.3 [3] [a]), or direct that OCFS place the respondent in a “limited secure facility” or a “non-secure facility” (Family Ct Act § 353.3 [3] [b], [c]). Finally, where a juvenile is determined to be mentally ill, mentally retarded, or afflicted with developmental disabilities, the court may place the child with OCFS or a commissioner of social services and direct that the commissioner temporarily transfer the child to the custody of the state Office of Mental Health or the state Office of Mental Retardation and Developmental Disabilities for appropriate treatment (Family Ct Act § 352.2 [1] [d]; § 353.4).
The dispositional sections of article 3 empower the Family Court to make certain broad directions concerning the placement of an adjudicated juvenile delinquent, such as the level of placement security or type of placement (Matter of Dowayne H., 278 AD2d 706, 707 [2000]). However, once the child is placed in the custody of the Commissioner of OCFS or a local commissioner of social services, it is the agency rather than the court which determines the exact setting of the child’s placement and the specific treatment to be provided (Matter of Lavar C., 185 AD2d 36, 41-42 [1992]; Matter of Kyle H., 297 AD2d 741, 742 [2002]; Matter of Christopher A., 305 AD2d 670, 671 [2003]). Thus, after a child is placed in OCFS custody, the statutes vest the authority to make postplacement decisions with the Commissioner of OCFS, who is authorized to determine such matters as whether or not to conditionally release a child to aftercare services (Executive Law § 510-a), whether to discharge a child from agency custody (Executive Law § 510-c), whether to transfer a child to the Office of Mental Health or the Office of Mental Retardation and Developmental Disabilities for treatment (Executive Law § 509), and whether or not to petition the Family Court for extension of the child’s placement (Family Ct Act § 355.3 [1] [social services commissioner or OCFS may petition to extend placement]). Notably, the decision as to whether to file a petition for an extension of placement is an executive rather than a judicial function (Matter of Miguel F., 178 AD2d 1026 [1991]; Matter of Dewayne B., 289 AD2d 571, 573 [2001]), and a court may neither compel nor prohibit the filing of a petition to extend a respondent’s placement (id.).
B
In this case, OCFS had not filed a petition seeking an extension of Robin’s placement pursuant to Family Court Act § 355.3 *342 at the time that the permanency petition was filed on February 15, 2008, and respondent’s placement was set to expire on March 11, 2008. However, upon review of the various reports appended to the permanency petition or otherwise submitted to the court and the parties, the court (with the knowledge, but not the consent, of respondent’s Law Guardian) suggested that the Commissioner of OCFS review its decision to not seek an extension of the child’s placement. Thereafter, the Commissioner filed to extend the respondent’s placement pursuant to Family Court Act § 355.3 along with an affidavit from a responsible OCFS official setting forth the reasons why that petition had not been filed at least 60 days prior to the date upon which respondent’s placement was to expire (see Family Ct Act § 355.3 [1]).
As previously stated, the court finds that OCFS has established the requisite good cause for the late filing of the petition to extend respondent’s placement based upon the severe deterioration of her behavior in the program at GrahamWindham within the 60-day period immediately preceding the expiration of her current placement (Matter of Loren S. at 858; Matter of Donald MM. at 635; see also Matter of Kacey H., 223 AD2d 876, 877 [1996]), and given Robin’s ongoing emotional and behavioral difficulties and her continuing need for supervision, treatment and confinement, a preponderance of the evidence establishes that an extension of placement is in her best interests and necessary to protect the community (Matter of Ashanti W., 242 AD2d 539 [1997]; Matter of Sabrina S., 256 AD2d 914, 916 [1998]; Matter of James T., 259 AD2d 705 [1999]; Matter of Michael RR., 266 AD2d 709, 710-711 [1999]; Matter of Mickie PP., 279 AD2d 943, 945 [2001]). However, based upon the record before the court, there can be no finding that OCFS and Graham-Windham have exercised reasonable efforts to make it possible for Robin to return safely to her mother’s home. Therefore, the petition for a finding of reasonable efforts is denied, although the court does approve the permanency plan for Robin which is either a return to parent or a discharge to independent living.
Robin has resided at Graham-Windham since June 7, 2007. The OCFS permanency petition states that its permanency plan for the child is for her to be discharged from the agency’s custody on March 11, 2008, since the agency believes that a discharge of Robin from placement is in the child’s best interests because the child’s “mother would like for respondent to return *343 to her residence upon successful completion of [her] treatment program at the Graham School . . . [and i]t would be in the child’s best interest to return to [her] mother’s home” (Jan. 18, 2008 petition for permanency hearing, at 3, ¶ 5 [c]).
The reports prepared by the staff at the Graham-Windham residential treatment center indicate that Robin is a young lady with behavioral, educational and psychological issues which have not been successfully addressed. While the child has had weekend home passes to visit with her mother those visits have not proceeded without incident. The reports indicate that Robin continues to have difficulties in obeying the reasonable directions of her mother, such as a curfew, and as recently as the Christmas and New Year holidays in 2007-2008, Robin appears to have spent at least one entire night away from home and it also appears that she spent the large majority of the visitation period away from her mother’s residence. The incidents which occurred during the 2007 holidays led to a suspension of Robin’s weekend visitation privileges for a period of at least one month. In addition, the agency’s updated report states that Robin engaged in a “physical altercation” with another female resident at the facility on “January 31st, 2008,” and she consistently has difficulty in following the directions of agency staff and in conforming her behavior to the rules of the facility.
Notably, Robin’s educational disabilities have been known to OCFS and Graham-Windham since she was first placed by this court. Although the child has been enrolled in a special education setting, the reports from Graham-Windham indicate that she has continued to struggle with her school work and the agency staff believes that she may have learning disabilities. The agency candidly admits that although Robin is enrolled in a 9th grade special education class, she “lacks the fundamentals to complete her school work and often becomes frustrated.” Other than providing the child with tutoring sessions and general counseling with a social worker at the agency, there is no indication that any other efforts have been made to address any learning disabilities or to provide Robin with counseling to ensure that she is able to successfully complete her education. The apparent lack of attention given to Robin’s educational shortcomings and possible learning disability is shocking. Because the permanency plan put forth by OCFS is to discharge Robin from OCFS custody, rather than an extension of placement so that aftercare can be provided to ensure that she is provided with any necessary services upon her release to the *344 community, the only effort which Graham-Windham intends to make is to assist Robin in enrolling for a public school. However, there is no mention of any enrollment in a specific school for the remainder of the 2007-2008 school year, and neither OCFS nor Graham-Windham will be empowered to compel the child to attend school upon her release from custody.[3]
C
Family Court Act § 355.5 does not define the term “reasonable efforts” for purposes of a permanency hearing in a juvenile delinquency proceeding and there is little guidance to be found in case law. As one appellate court has observed, “[w]e know of no . . . case, and the parties have cited none, that discusses the constituent elements of a permanency plan for a juvenile delinquent” (In re Darien S., 82 Conn App 169, 174, 842 A2d 1177, 1180-1181 [2004], cert denied 269 Conn 904, 852 A2d 733 [2004]).[4] However, in another case it was observed by the Supreme Court of Wisconsin, a state which has adopted permanency planning for juvenile delinquents, that
“[i]f a provision of the dispositional order includes placement of the juvenile in a foster home, treatment foster home, group home, child caring institution, secure detention facility or shelter care facility, a ‘permanency plan’ must be prepared to ‘ensure that a juvenile is reunified with his or her family whenever possible, or that the juvenile quickly attains a placement or home providing long-term stability.’ Wis. Stat. § 938.38(1). The goals of the permanency plan include ‘ensuring] proper care and treatment of the juvenile,’ ‘meet[ing] the juvenile’s physical, emotional, social, educational and vocation needs,’ and ‘improving] the conditions of the parents’ home to facilitate the return of the *345 juvenile . . . ’ Wis. Stat. § 938.38(4)(f)” (In Interest of Hezzie R., 219 Wis 2d 848, 876, 580 NW2d 660, 670 [1998], cert denied sub nom. Ryan D.L. v Wisconsin, 525 US 1150 [1999]).
In one New York case, the Appellate Division affirmed Family Court’s order which extended the placement of an adjudicated juvenile delinquent with the Department of Social Services and also approved the Department’s permanency plan for the child, without specifying the elements which constitute a permanency plan for a juvenile delinquent (Matter of Martin E., 23 AD3d 959 [2005]). In affirming Family Court’s order, the Appellate Division agreed that Family Court properly “determined that petitioner made reasonable efforts with both respondent and his mother to assist in respondent’s safe return home” (id. at 960). In one other case, Judge Bivona of Orange County Family Court states that at a permanency hearing in a juvenile delinquency proceeding, “[i]t is incumbent upon the Court to ensure that the agency having custody after formulating a permanency plan [has made] reasonable efforts to effect[uate] that plan” (Matter of S.S., 6 Misc 3d 1031 [A], 2005 NY Slip Op 50262[U], *4 [2005]).
Notwithstanding the absence of a statutory definition of “reasonable efforts” for purposes of a juvenile delinquency proceeding and the limited case law, Family Court Act § 355.5 (7) (a) does provide that the Family Court is required to “consider and determine” whether “reasonable efforts were made to make it possible for the respondent to return safely to his or her home.” Giving effect to the plain language of the statute and considering the interpretation of identical or similar statutory language given by other courts, it would appear that this court should “consider and determine” whether OCFS and Graham - Windham have formulated a feasible permanency plan for the child and whether the agencies have taken reasonable steps to put that plan into effect (In re Darien S., 82 Conn App at 172, 842 A2d at 1179; Matter of S.S. at *4). In addition, as stated by another appellate court, the court should consider the extent of progress by the child and his or her parent or parents toward alleviating the conditions which caused the placement of the child (In re James R., 153 Cal App 4th 413, 433, 62 Cal Rptr 3d 824, 838-839 [1st Dist 2007]).
Accordingly, in determining whether reasonable efforts have been made the court should consider whether the permanency plan sets forth an appropriate goal for the child, whether reasonable efforts have been expended to make it possible for the *346 respondent to return safely home, or if the permanency goal does not involve a return of the child to his or her parent, whether reasonable efforts have been made to achieve and finalize such goal (Family Ct Act § 355.5 [7] [a]; Matter of Martin E. at 960; In Interest of Hezzie R., 219 Wis 2d at 876, 580 NW2d at 670). To that end, the court may specifically consider whether the agency has developed a plan which is designed to “meet[ ] the juvenile’s physical, emotional, social, educational and vocational] needs” (Hezzie R., 219 Wis 2d at 876, 580 NW2d at 670, citing Wis Stat Ann § 938.38 [4] [f]), and the services provided to both the child and the parent in order to address the conditions which led to the placement of the child in the first instance (In re James R., 153 Cal App 4th at 433, 62 Cal Rptr 3d at 838-839).
In this case, the court has considered whether reasonable efforts were made to make it possible for Robin to return safely to her mother’s custody, the stated permanency goal which has been advanced by OCFS. Based upon a totality of the evidence adduced at the hearing, the court finds the permanency goal of return to parent or discharge to independent living is appropriate; however the court does not find that OCFS and GrahamWindham have made reasonable efforts to effectuate the initial permanency plan of return to parent in March 2008 and the petition for a finding of reasonable efforts is denied for the reasons summarized below.
Robin’s mother is not presently able or willing to have the child return to her home at this time and little or no effort has been made by the agencies to provide services to the mother to prepare her to reassume custody of the child. The mother has not been significantly involved in planning for Robin’s future during her placement, and there appears to have been little if any family counseling provided to the mother and Robin. In addition, the mother has been inconsistent in her expressed desire and willingness to have Robin return to her home at this time. Notably, although Robin has resided with her since the age of seven, at one point the mother disclaimed parental responsibility for the child by claiming that her parental rights have been extinguished through a foreign adoption. More recently, the mother advised Robin’s Law Guardian that she had no desire to have the child return to her custody. Moreover, at the present time, the mother is away on an extended visit to Guyana and she is not available to care for the child.
Robin is clearly not prepared to return safely to her mother’s home at this time, and she continues to pose a risk of harm to *347 the community. Graham-Windham has been arranging weekend home visitation for Robin for the past several months as a precursor to her discharge from custody. The evidence strongly suggests that while home on visits, the child is unable to follow reasonable limits set by her mother, as indicated by her curfew violations and her failure to come home at all one night. In addition, there is evidence that the mother is either unwilling or unable to set and enforce limits on Robin’s activities and behavior. There is no indication that the agency has taken any steps to remedy this situation and its response has been to temporarily suspend weekend home visits. This is surprising, given that the agency’s own social worker has recommended joint parent and child counseling and has indicated that Robin is not prepared for a discharge to her mother’s custody at the present time.
Robin’s educational needs have not been met by the agencies during her placement and a viable educational component for the permanency plan has yet to be formulated. The evidence establishes that Robin is a special education student with behavioral difficulties, including recent truancy from school at Graham-Windham. The agency has reported that Robin regularly refuses to attend class or tutoring sessions offered by Graham School. While Robin is reported to have learning disabilities, there seems to be no coherent plan in place to address that deficit. The agency’s staff has repeatedly indicated that Robin “lacks the fundamentals to complete her school work and often becomes frustrated,” and she is now failing all of her classes, yet the sole plan put forth is that the agency will assist the mother in enrolling the child in a public school after she is discharged from OCFS custody. This child requires a needs-specific personal education plan and the efforts put forth in this regard to date are simply not acceptable nor reasonable.
Robin is an emotionally troubled youngster with unresolved behavioral issues, yet there seems to have been no concerted effort to provide her with psychological or psychiatric counseling, including medication if appropriate, nor is there any concrete plan to provide mental health services for the child upon her discharge. While counseling by an agency social worker has been implemented, the child continues to display symptoms of emotional turbulence, as evidenced by her recent admission to a psychiatric hospital, and it may be appropriate to implement a higher level of care once the child is released from the hospital. At this time, it is not possible to ascertain when it will be clini *348 cally advisable for the child to return home and what type of ongoing counseling Robin will require once she is home so that she can successfully function in the community. Given the mother’s expressed ambivalence toward a return of Robin to her home, it is simply not reasonable to assume that the mother will undertake to arrange for appropriate counseling and medical care upon discharge of the child to her custody. The agency’s plan is particularly troubling since it does not include any aftercare supervision by OCFS staff to ensure that the child is provided with the care she requires and to ensure that the mother is cooperating in that regard.
Finally, an immediate implementation of the original permanency plan of return to parent by permitting Robin’s placement to simply expire and discharging her to her mother without further supervision by the agency is illogical and ill-advised given the information which has been available to OCFS all along.[5] Robin’s mother has on some occasions indicated that she could accept the child home, but she requires continuing assistance from OCFS or Graham-Windham. The statutory scheme which governs placement of juvenile delinquents provides for the conditional release of a child to his or her parent in the community during the period of placement in the sole discretion of OCFS (Executive Law § 510-a).[6] Such conditional release, as opposed to an outright discharge from OCFS custody pursuant to Executive Law § 510-c (1), is not designed to be without continued supervision by OCFS because the statute defines “conditional release” as “the transfer of a youth from facility *349 status to aftercare supervision under the continued custody of [OCFS]” (Executive Law § 502 [7]). In addition, OCFS can mandate compliance with specific treatment or programs and ensure that a child adheres to specific rules and conditions, given that the statute authorizes the Commissioner to revoke a conditional release and to return the child to an OCFS facility or an authorized agency without court order.
Accordingly, the petition to extend placement of Robin G. with OCFS is granted. To the extent that the permanency petition seeks a finding of reasonable efforts it is denied and the permanency plan for the child is otherwise approved.

. The Uniform Rules for Family Court (22 NYCRR) provide that “[a] petition for a permanency hearing and, if applicable, an extension of placement, pursuant to sections 355.3 and 355.5 of the Family Court Act, shall be filed at least 60 days prior to the expiration of one year following the respondent’s entry into foster care” (22 NYCRR 205.28 [d] [1]). If a respondent remains in placement, subsequent permanency hearing petitions must be filed “at least 60 days prior to the expiration of one year following the date of the preceding permanency hearing” (22 NYCRR 205.28 [d] [2]).

. 22 NYCRR 205.28 (d) (3) provides, in pertinent part, that
“[t]he permanency petition shall include, but not be limited to, the following: . . . the proposed permanency goal for the child; the reasonable efforts, if any, undertaken to achieve the child’s return to his or her parents or other permanency goal; . . . and current information regarding the status of services ordered by the court to be provided, as well as other services that have been provided, to the child and his or her parent or parents.”

. If Robin’s placement was extended and she was to be conditionally released to aftercare by OCFS, the agency would continue to be responsible for the child’s care, and the agency would be required to provide the child with any necessaries and services, including assistance with obtaining an education, employment or enrollment in a vocational program (Executive Law § 510-a [l]-[3]).

. As the Court noted in In re Darien S., the lack of case law addressing permanency hearings in juvenile delinquency proceedings is not surprising because “while all fifty states have adopted permanency plan procedures for abused and neglected children, only [six] states have adopted similar procedures for delinquent children. These [six] states are California, Kansas, Kentucky, New York . . . Wisconsin” and Connecticut (Darien S., 82 Conn App at 176, 842 A2d at 1182).

. Had a permanency petition not been filed by OCFS there would have been no judicial consideration of the agency’s plan to allow placement to expire with an automatic return of the child to her mother’s custody.

. The statute provides, in pertinent part, that OCFS
“may conditionally release any youth placed with [OCFS] to aftercare whenever it deems such conditional release to be in the best interest of the youth, that suitable care and supervision can be provided and that there is a reasonable probability that the youth can be conditionally released without endangering the public safety” (Executive Law § 510-a [1]).
In addition, OCFS may return a child to an OCFS facility or to the custody of an authorized agency “at any time within the period of placement, where there is a violation of the conditions of release or a change of circumstances” (Executive Law § 510-a [2]). The decision to conditionally release a child to aftercare and the conditions imposed upon that release rest solely with OCFS (Matter of Christopher A., 305 AD2d 670, 671 [2003]; Matter of Dewayne B., 289 AD2d 571, 573 [2001]). It should be noted that OCFS is required to report as to its plan for the release or conditional release of a child placed in its custody (22 NYCRR 205.28 [d] [4]).